John J. **DILLON**, III, Commissioner of the Indiana Department of Insurance and The Patient's Compensation Fund, Appellants–Defendants,

v.

Linda **CALLAWAY**, Appellee–Plaintiff.

No. 49A02–9204–CV–145.

Court of Appeals of Indiana, Second District.

Feb. 22, 1993.

Transfer Denied May 12, 1993.

Catherine A. Kling, Indianapolis, for appellants-defendants.

Thomas C. Doehrman, Conour–Doehrman, Indianapolis, for appellee-plaintiff.

## CASE SUMMARY

FRIEDLANDER, Judge.

Defendants-appellants John Dillon, the Commissioner of the Indiana Department of Insurance and the Administrator of the Patient's Compensation Fund (the Fund) appeal from the trial court's award of damages to plaintiff-appellee Linda Callaway (Callaway) on her petition for excess damages from the Fund, claiming Callaway's

1. Ind.Code 16–9.5 *et seq.* (1992 Supp.).

injuries resulting from a sexual relationship with her doctor during treatment were not compensable under Indiana's Medical Malpractice Act (the Act).[1]

We affirm.

### FACTS

The facts most favorable to the trial court's judgment reveal that in March, 1981, Callaway was hospitalized for multiple joint pain. Dr. Richard Kelly Chambers (Dr. Chambers) began treating her during the hospitalization, and he continued treatment for various physical ailments, including abdominal pain and headaches. Dr. Chambers was unable to ascertain a physical cause for Callaway's maladies and thus suspected a psychological cause for her pain.

Dr. Chambers suggested in 1982, as Callaway's problems persisted, that she talk about her problems, and Dr. Chambers began scheduling therapy sessions at his office. During the therapy sessions, Callaway related incidents of sexual abuse by her father and that she was having sexual problems with her husband.

Sometime during 1983, a sexual relationship between Dr. Chambers and Callaway developed as a result of Dr. Chambers' conduct. The relationship was sexually abusive, perverted and sadomasochistic in nature. During the therapy sessions, and under the guise of therapy, Dr. Chambers and Callaway engaged in bizarre and perverted sexual conduct. After several years of this treatment and relationship, Callaway suspected Dr. Chambers' prescribed form of therapy was inappropriate. After conferring with another physician, Callaway stopped seeing Dr. Chambers in January 1987.

Callaway was hospitalized in February 1987, with major depressive symptoms including severe depression with suicidal thought and feelings of being overwhelmed, anorexia, and agoraphobia all determined to be a result of the abusive and sadomasochistic treatment administered by Dr. Chambers.

Callaway filed her medical malpractice action against Dr. Chambers. Dr. Chambers and his insurer settled their liability with Callaway and agreed to pay her $100,000 in structured payments with a present value greater than $75,000, as required by Ind.Code 16-9.5-2-2. Callaway then sought excess damages from the Fund pursuant to IC 16-9.5-4-3. After a trial, the trial court awarded Callaway $400,000 payable from the fund.

### ISSUE

Whether the trial court erred when it awarded Callaway excess damages from the Fund?

### DECISION

PARTIES' CONTENTIONS—The Fund claims that the legislature did not intend for the Act to be applied to a doctor's sexual relationship with a patient and that Callaway's injuries did not result from the provision of health care services. Callaway responds that because Dr. Chambers and his insurer settled with Callaway, their settlement foreclosed the issue of liability and the Fund is obligated to compensate Callaway.

CONCLUSION—Callaway's injuries are within the scope of the Act, and she was properly awarded damages from the Fund.

Callaway, relying on this court's recent decision in *Dillon v. Glover* (1992), Ind. App., 597 N.E.2d 971, *trans. denied*, argues that because Dr. Chambers and his insurer settled their liability with her, the Fund could not relitigate the issue of Dr. Chambers' liability, but could only contest the amount of damages to be awarded for her injuries.

In *Glover*, the Fund argued that the doctor's negligence did not proximately cause the patient's death, and the patient was therefore not entitled to excess damages. We specifically rejected the Fund's argument that the doctor's and his insurer's settlement with the patient was only an admission of negligence, and that the issue of proximate causation could be litigated. We concluded that once liability was established, proximate cause had been decided.

■ However, in *Glover*, we distinguished this court's previous decision in *Eakin v. Kumiega* (1991), Ind.App., 567 N.E.2d 150, in which we concluded that an admission of liability did not obligate the Fund to compensate claimants for noncompensable injuries. Similarly, the Fund's argument here, that Callaway's sexual relationship with Dr. Chambers did not fall within the scope of the Act, relates to the question of whether Callaway's injuries are compensable under the Act. Therefore, unlike the issue of proximate cause in *Glover*, the compensable nature of Callaway's injuries was not decided by her settlement of liability with Dr. Chambers and his insurer, and is properly before us.

Turning to the Fund's claim that Dr. Chambers' sexual relationship with Callaway did not constitute the provision of health care services, this court recently examined the issue of sexual conduct between doctors and patients in *Collins v. Covenant Mut. Ins. Co.* (1992), Ind.App., 604 N.E.2d 1190.

In *Collins*, a patient was appealing from a declaratory judgment obtained by her doctor's insurer absolving it of liability for the doctor's conduct. Included in the patient's claims against the doctor were allegations that the doctor's sexual relationship with the patient constituted medical malpractice. After surveying the treatment of the issue in other jurisdictions, we applied the generally developed rule that a typical physician's sexual relationship with a patient did not constitute the rendition of health care services, and was not actionable as medical malpractice.

However, we recognized that a significant exception existed with respect to a therapist's sexual relationship with a patient. Focusing on the role of the "transference phenomenon" in psychiatric therapy, we distinguished cases from a number of jurisdictions which had concluded that a therapist's sexual conduct gave rise to a malpractice claim.

In *Collins*, we considered the Minnesota Supreme Court's excellent treatment of the issue in *St. Paul Fire & Marine Ins. Co. v.*

*Love* (1990), Minn., 459 N.W.2d 698, in which the Court explained:

"To better understand this case, we need to describe transference. This phenomenon is '[t]he process whereby the patient displaces on to the therapist feelings, attitudes and attributes which properly belong to a significant attachment figure of the past, usually a parent, and responds to the therapist accordingly.' S. Waldron–Skinner, *A Dictionary of Psychotherapy* 364 (1986). Transference is common in psychotherapy. The patient, required to reveal her innermost feelings and thoughts to the therapist, develops an intense, intimate relationship with her therapist and often 'falls in love' with him. The therapist must reject the patient's erotic overtures and explain to the patient the true origin of her feelings. A further phenomenon that may occur is countertransference, when the therapist transfers his own problems to the patient. When a therapist finds that he is becoming personally involved with the patient, he must discontinue treatment and refer the patient to another therapist."

*Love, supra* at 700.

The court continued:

"Transference, of course, occurs at times in other relationships including that of medical doctor and patient, but the therapist alone elicits transference as a regular, accepted part of his practice in treating marital and sexual disorders. [Citation omitted]. The therapist must encourage the patient to express her transferred feelings, while rejecting her erotic advances.... In short, the therapist must both encourage transference and discourage certain aspects of it. This may be difficult to do and presents an occupational risk. The therapeutic alliance in this situation gives rise to a duty, imposed by professional standards of care as well as by ethical standards of behavior, to refrain from a personal relationship with the patient, whether during or outside therapy sessions."

*Id.* at 701.

The Court used the term "therapist" to refer to psychologists, psychiatrists or other professionals who held themselves out as engaging in psychotherapy or counseling therapy for marital, family or sexual problems. The Court's comments in *Love* are particularly poignant here. Callaway presented expert testimony relating to the transference phenomenon, and her expert attributed the development of the sexual relationship to the transference phenomenon. *Record* at 372–76. Further, the trial court entered the following findings concerning Dr. Chambers' and Callaway's relationship:

"7. The evidence at trial established that a doctor/patient relationship existed between the [sic] Callaway and Dr. Chambers from on or about March 17, 1981 through at least on or about January 27, 1987. Beginning on or about January 31, 1983 through November of 1986, the evidence established that under the guise of therapy and treatment for Callaway's problems of low self-esteem, overwhelming anxiety, history of sexual abuse by her father, and psychosomatic illness, the health care provider, Dr. Chambers induced Callaway to engage in a sexual relationship which became sadomasochistic in nature and led to Callaway's hospitalization for a severe psychotic break and suicidal depression.

8. That on or about January 31, 1983, Dr. Chambers told the Plaintiff that in order for her to overcome her overwhelming anxiety, low self-esteem, and continuing psychosomatic illnesses, it was important that she talk to him about her problems and write down all her fears, fantasies and problems so that they could discuss them at regular therapy sessions at his office. Thereafter, at appointments arranged by Dr. Chambers' receptionist/medical assistant, Plaintiff met Dr. Chambers at his office every week or two throughout 1983 and 1984 for therapy sessions.

9. During these therapy sessions, Callaway was encouraged by Dr. Chambers to discuss all of her past problems with him. Callaway eventually described in detail to Dr. Chambers her past history of severe sexual abuse which she had

suffered at the hands of her father when she was a small child. She also revealed to Dr. Chambers that she was having problems with her marriage and had always hated sex.

10. Thereafter, after about five (5) months of these weekly therapy sessions, early in the summer of 1983, Dr. Chambers told Callaway that in order for her to learn to overcome her problems with sex, she needed to have sex with a man whom she could trust and that he would be the one she could trust for these purposes. Dr. Chambers then induced Callaway to engage in sexual relations at his office at the therapy sessions, the appointments for which his receptionist/medical assistant continued to arrange with Callaway. These sessions continued throughout 1985 and 1986 on a regular basis and included increasingly bizarre sexual conduct of a sadomasochistic nature with Dr. Chambers encouraging Callaway to humiliate him in various deviate ways ostensibly as a means of making her stronger and allowing her to release her anger which she had felt towards her father since her childhood abuse. Callaway thought throughout this period of time that she was being helped by these activities. She believed Dr. Chambers when he told her that it was necessary treatment for her to overcome her physical and emotional problems."

*Record* at 213–14.

■ Dr. Chambers' and Callaway's sexual relationship was unquestionably the product of a mishandling of the transference phenomenon during the therapy sessions administered by Dr. Chambers. The trial court's findings make clear that Dr. Chambers was acting as Callaway's therapist, even if he was not a practicing psychiatrist. Callaway's injuries therefore arose from the rendition of health care services by a health care provider and her malpractice claim against Dr. Chambers falls within the purview of the Act. *See Anclote Manor Found. v. Wilkinson* (1972), Fla. Dist.Ct.App., 263 So.2d 256; *St. Paul Fire & Marine Ins. Co. v. Mitchell* (1982), 164 Ga.App. 215, 296 S.E.2d 126; *Collins, su-*

*pra; Vigilant Ins. Co. v. Kambly* (1982), 114 Mich.App. 683, 319 N.W.2d 382; *Cotton v. Kambly* (1980), 101 Mich.App. 537, 300 N.W.2d 627; *Love, supra; L.L. v. Medical Protective Co.* (Ct.App.1984) 122 Wis.2d 455, 362 N.W.2d 174.

■ Just as in *Collins*, we also reject the Fund's argument that coverage under the Act should not be extended to Dr. Chambers' actions in accordance with the public policy against insuring intentional acts. In considering this same argument, the court in *Vigilant, supra,* concluded:

"Moreover, the public policy considerations raised by plaintiff which prohibit the insurability of criminal or intentionally tortious acts are not present here. Initially, it is unlikely that the insured was induced to engage in the unlawful conduct by reliance upon the insurability of any claim arising therefrom or that allowing insurance coverage here would induce future similar unlawful conduct by practitioners. Nor does it appear that the policy was obtained in contemplation of a violation of the law. [Citation omitted]. Furthermore, coverage does not allow the wrongdoer unjustly to benefit from his wrong.. It is not the insured who will benefit, but the innocent victim who will be provided compensation for her injuries. [Citation omitted]. In this instance, there is great public interest in protecting the interests of the injured party."

*Id.* at 687–88, 319 N.W.2d at 385.

Because Callaway's claim against Dr. Chambers falls within the patient/therapist exception recognized in *Collins*, the trial court did not err when it awarded her excess damages from the Fund.

Judgment affirmed.

GARRARD, J., concurs.

SHIELDS, J., concurs in result with opinion.

SHIELDS, Judge, concurring in result.

I concur in result because the issue raised by John Dillon, Commissioner of the

Indiana Department of Insurance and Administrator of the Patient's Compensation Fund (the Fund), is foreclosed by the settlement made by Dr. Chambers and his insurer with Linda Callaway and, therefore, the trial court did not err when it awarded Callaway excess damages from the Fund. In my opinion, the Fund's arguments that the Act does not apply to Dr. Chambers's sexual relationship with Callaway and that Callaway's injuries were not the proximate result of health care services provided by Dr. Chambers raise an issue of liability rather than an issue of whether particular damages asserted by Callaway are compensable within the Act. Therefore, because "a health care provider or its insurer [Dr. Chambers and his insurer] has agreed to settle its liability on a claim by payment of its policy limits," IC 16–9.5–4–3 (1988), this court's decisions in *Dillon v. Glover* (1992), Ind.App., 597 N.E.2d 971, and *Eakin v. Kumiega* (1991), Ind.App., 567 N.E.2d 150, compel the determination that the issues the Fund attempts to present are precluded.