James ATTERHOLT, Commissioner of Insurance of Indiana, and the Patient Compensation Fund of Indiana, Appellants–Defendants,

v.

Marilyn Ruth ROBINSON, Personal Representative of the Estate of Irene H. Gray, Deceased, Appellee–Plaintiff.

No. 49A02–0701–CV–43.

Court of Appeals of Indiana.

Aug. 22, 2007.

Susan E. Cline, Julia Blackwell Gelinas, Maggie L. Smith, Lucy R. Dollens, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Appellants.

George Clyde Gray, Daniel L. Robinson, Gray Robinson Ryan & Fox, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellants-defendants James Atterholt, the Commissioner of Insurance of Indiana, and the Patient Compensation Fund of Indiana (collectively, the Fund) appeal the trial court's $1,250,000 judgment in favor of appellee-plaintiff Marilyn Ruth Robinson, the personal representative of the Estate of Irene H. Gray (the Estate). Specifically, the Fund argues that the trial court erred by allowing the Estate to recover $1,250,000 of damages pursuant to the Indiana Survival Act (the Survival Act)[1] because it should have, instead, awarded damages pursuant to the Indiana Adult Wrongful Death Statute (the AWDS).[2] Alternatively, the Fund argues that even if the trial court did not err by awarding damages pursuant to the Survival Act, the award was excessive. Concluding that the trial court erred by not allowing the Fund to challenge the theory of compensation at the damages hearing but that such error was harmless and the resulting award was not excessive, we affirm the judgment of the trial court.

### FACTS [3]

Irene Gray was born on March 17, 1921. She married and had three children, including Robinson. Irene's husband died in 1986. Irene continued to live in the family home, but her children began to notice a decline in her health in 1997. Irene began receiving home healthcare services in 2000.

On January 5, 2001, Irene moved into Keystone Woods Assisted Living (Keystone Woods). While Irene still had her own living quarters, Keystone Woods provided more safety and assistance than Irene had received from home healthcare services. However, the staff from Keystone Woods approached Irene's family on February 12, 2003, and ultimately suggested that Irene be moved to a more restrictive facility because the staff was concerned for her safety. The staff informed the family that, on various occasions, Irene had fallen in the shower, left her room without clothing, and approached a busy street.

Irene moved into North Woods Village (North Woods) in Kokomo in February 2003 and began receiving assistance with her daily activities. Although the initial care "start[ed] out quite well," appellee's br. p. 7, Robinson soon began to notice a decline—Irene's fingernails and toenails were not being groomed and, on one occasion, Robinson noticed that her mother had feces under her nails.

On February 1, 2004, the North Woods staff put Irene to bed for a nap but neglected to dress her in the adult brief she always wore. While napping, Irene urinated and some of the urine spilled onto the floor. When Irene stepped onto the floor, she slipped in the urine and hit her head on a nightstand. Irene laid on the floor for an undetermined amount of time until the North Woods staff discovered her. Later that afternoon, North Woods called Robinson to tell her that Irene had

---

1. Ind.Code §§ 34–9–3–1 et seq.

2. Ind.Code § 34–23–1–2.

3. We held oral argument on this matter in Indianapolis on July 30, 2007.

been taken to St. Joseph's Hospital in Kokomo. The hospital's doctors evaluated Irene and closed the wound on the back of her head with three staples. Irene was released to North Woods later that day.

The next day, Irene was in immense pain and North Woods sent her back to the hospital. The doctors concluded that Irene had broken her hip when she fell, and she had hip surgery on February 3. Irene was hospitalized until February 7, and she returned to North Woods upon her release.

Shortly after her return, Irene developed pressure ulcers, which worsened over the next few months. By February 18, Irene had irritated skin surrounding her coccyx, a Stage I wound on her left ankle, and a Stage II wound on her left heel. On March 1, a North Woods nurse observed a moderate amount of wound drainage, and Irene's left heel had turned black by March 28. By July 14, the lesions to Irene's coccyx and heel had been classified as Stage IV[4] wounds and her coccyx wound showed exposed bone. Both wounds had drainage and sloughing skin and emitted a foul odor.

Howard Wound Care Center Dr. Pinnamaneni performed a full-thickness debridement[5] of the wounds on July 20, 2004. Dr. Pinnamaneni described the wounds as "chronic" and "nonhealing" and noted that both wounds showed exposed muscle. Appellants' App. p. 81. Given the extent of the wounds, Dr. Pinnamaneni recommended follow-up surgical debridements.

Between July 27 and September 16, Irene had nine debridement surgeries on her heel and eight debridement surgeries on her coccyx.

Robinson did not learn of the severity of Irene's coccyx wound until July 27, the day the Wound Care Center staff invited her to see the wound. Robinson called her sister, Judith Irene Gray, and both became "most upset at what [Robinson] had seen." *Id.* at 206. Robinson and Gray went to North Woods and, coincidentally, the State Department of Health (DOH) was inspecting the facility at the same time. The sisters talked with the DOH surveyors and decided to remove their mother from North Woods.

Irene was moved to Century Villa on July 29, 2004. Robinson soon noticed positive changes in her mother—Irene seemed more relaxed, began eating more, and her wounds began healing. However, Irene died on September 24, 2004. Her death certificate listed the cause of death as "acute renal failure and severe hypernatremia."[6] Appellee's App. p. 84. The medical bills attributable to Irene's fractured hip and the resulting pressure ulcers totaled $95,878.22.

The Estate filed a proposed complaint against North Woods with the Indiana Department of Insurance on December 21, 2004. The complaint alleged breach of contract, negligence, and wrongful death, and sought damages pursuant to the AWDS or, alternatively, the Survival Act. The parties reached a settlement in May

---

**4.** Stage IV classification is reserved for the most severe pressure ulcers—i.e., wounds where "the affected area decays to the point of exposing muscle and bone." Michael Stockham, *"This Might Sting a Bit": Policing Skin Care in Nursing Facilities by Litigating Fraud,* 87 Cornell L.Rev. 1041, 1069 (2002).

**5.** "Debridement" is a "[s]urgical excision of dead, devitalized, or contaminated tissue and

removal of foreign matter from a wound." *The American Heritage Dictionary* 468 (4th ed.2000).

**6.** "Hypernatremia" is an "abnormally high plasma concentration of sodium ions." *The American Heritage Dictionary* 864 (4th ed.2000).

2006 (the settlement agreement), which provided that North Woods would pay the Estate $250,000 and that the Estate would have "the right to pursue the collection of damages in excess [of $250,000] from [the Fund] pursuant to I.C. § 34–18–15–3 [of the Indiana Medical Malpractice Act]." Appellants' App. p. 39. The settlement agreement released North Woods from all of the Estate's claims but did not specify whether the damages were awarded pursuant to the AWDS or the Survival Act.

On May 10, 2006, the Estate filed a petition with the trial court to determine the amount of excess damages it could recover from the Fund. The Fund indicated that it would award the Estate the amount of excess statutory damages available pursuant to the AWDS, but the Estate claimed that it was entitled to damages pursuant to the Survival Act and demanded $1,000,000 from the Fund.

On October 2, 2006, the Fund filed a motion to define recoverable damages or, in the alternative, for a preliminary determination and clarification of the underlying settlement agreement. Because the settlement agreement did not specify the theory of recovery, the Fund's motion asked the trial court to clarify whether a wrongful death claim or an injury survival claim "prevailed in the payment of damages by the defendants in the underlying claim." Appellee's App. p. 5. The Estate responded on October 10, 2006, arguing that the underlying settlement agreement with North Woods controlled both claims and that the settlement did not contain a stipulation or admission of liability. The trial court denied the Fund's motion to clarify on November 21, 2006.

After the trial court denied the Fund's motion, the Fund disclosed that it intended to argue that North Woods's negligence had caused Irene's death and that additional damages should be awarded pursuant to the AWDS. In response, on November 30, the Estate filed a motion to exclude any evidence of causation, arguing that the Fund could not litigate the cause of death in order to defeat liability for the personal injury claim because the claim survived Irene's death pursuant to the Survival Act. On December 4, 2006, the trial court granted the Estate's motion to exclude any evidence contesting the causation of Irene's death, ordering that the Fund "is precluded from offering any evidence contesting liability or causation at the damages hearing." *Id.* at 55.

On December 5, 2006, the trial court held a bench trial regarding the Estate's damages. On December 27, 2006, the trial court entered findings of fact and conclusions of law and ordered judgment in favor of the Estate, finding that the Estate was entitled to $1,250,000 in total damages and that the Fund was responsible for $1,000,000. In relevant part, the trial court found that:

### FINDINGS OF FACT

\* \* \*

(29) The Court finds that the cause of death indicated on the death certificate and the Affidavit of Dr. Marler, the treating physician, that Irene Gray died from causes other than the underlying defendant's neglect, out-weights the opinion of Dr. Lammers on the cause of death, which the Fund relied on for its argument that the [Estate] is only entitled to pursue wrongful death damages.

(30) The evidence on cause of death from Dr. Marler and Dr. Lammers, considered as a whole, does not establish any basis to bar the Estate from its election to obtain excess damages from the Fund on the survival injury claim of Irene Gray.

* * *

## CONCLUSIONS OF LAW

* * *

(3) This matter is governed by the terms of the Indiana Medical Malpractice Act, I.C. 34–17–1–1 et seq.

(4) [The Estate] settled [its] cause of action with The Health & Hospital Corporation of Marion County d/b/a North Woods Village.

(5) As a condition precedent to a party petitioning the Patient's Compensation Fund, a healthcare provider or its insured must have agreed to settle its liability for its policy limits of $250,000.

(6) Pursuant to I.C. 34–18–14–3(b), a healthcare provider qualified under the terms of the Indiana Medical Malpractice Act is not liable for an amount in excess of $250,000.

(7) The settlement with the underlying healthcare provider qualified the [Estate] to seek excess damages from the Indiana Patient Compensation Fund pursuant to the Indiana Medical Malpractice Act.

(8) Liability and causation were not an issue in the trial for excessive damages from the Patient Compensation Fund.

(9) The [Estate] was entitled to seek personal injury excess damages arising from the bodily injury claim of Irene Gray which survived her death from other causes pursuant to the Survival Act.

(10) The damages caused to Irene Gray by the negligent nursing home exceed the amount allowed by law and the Court will reduce the damages to the statutory limit available from the Patient's Compensation Fund.

## JUDGMENT

The Court therefore finds in favor of the [Estate], and assesses that the [Estate] is entitled to recover from the Indiana Patient's Compensation Fund excess damages in an amount over and above the underlying settlement from the healthcare provider's limit of $250,000, and the Court hereby enters JUDGMENT in favor of the [Estate] and against the [Fund] for excess damages over and above the healthcare provider's underlying limit of $250,000, in the amount of One Million Dollars ($1,000,000) to be paid by the Fund to the [Estate] as excess damages pursuant to the Indiana Medical Malpractice Act.

Appellants' App. p 18–19. The Fund now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

 Construction of the applicable statutes and the parties' settlement agreement are both subject to a de novo standard of review. *See Harrison v. Thomas,* 761 N.E.2d 816 (Ind.2002) (holding that the construction of terms of a written settlement agreement are a question of law reviewed de novo); *Vanderburgh County Election Bd. v. Vanderburgh County Democratic Cent. Comm.,* 833 N.E.2d 508, 510 (Ind.Ct.App.2005) (holding that statutory interpretation is a question of law that is reviewed de novo). However, the decision of the trial court is cloaked with a presumption of validity and "a tie at the appellate level goes to the winner in the trial court, even if that party had the burden of proof or persuasion in the trial court." *Stroud v. Lints,* 790 N.E.2d 440, 445 (Ind. 2003).

 The parties disagree about the proper standard of review to be applied to the trial court's special findings of fact and conclusions of law pursuant to Trial Rule 52(A). Typically, when reviewing a judgment based on such findings, we must first determine whether the evidence supports

the findings and then determine whether the findings support the judgment. *Gov't Payment Serv., Inc. v. Ace Bail Bonds,* 854 N.E.2d 1205, 1208 (Ind.Ct.App.2006), *trans. denied.* We will set aside the trial court's findings of fact and judgment only if they are clearly erroneous. T.R. 52(A). Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them and the judgment is clearly erroneous if it is unsupported by the findings and conclusions thereon. *Purcell v. S. Hills Invs., LLC,* 847 N.E.2d 991, 996 (Ind.Ct.App. 2006). In assessing whether findings are clearly erroneous, we will not reweigh the evidence nor judge the credibility of the witnesses. *Pitman v. Pitman,* 721 N.E.2d 260, 263–64 (Ind.Ct.App.1999). Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* A finding or conclusion is clearly erroneous when our review of the evidence leaves us with the firm conviction that a mistake has been made. *Yanoff v. Muncy,* 688 N.E.2d 1259, 1262 (Ind.1997). While we defer to the trial court's findings of fact, we do not defer to its conclusions of law. *In re Estate of Powers,* 849 N.E.2d 1212, 1216 (Ind.Ct.App.2006).

The Fund argues that because the trial court adopted the Estate's proposed findings and conclusions nearly verbatim, the findings and conclusions are not entitled to the same deference that they normally receive. *See Prowell v. State,* 741 N.E.2d 704, 709 (Ind.2001) (observing that when a trial court adopts the proposed findings and conclusions of a party verbatim, "there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court"). Furthermore, the Fund argues

that an even less deferential standard of review is applicable here because the adopted findings were based on a *"paper record* only." Appellants' Br. p. 13 (emphasis in original).

We first note that the trial court's findings were not based entirely on a paper record. The trial court held an evidentiary hearing in which Irene's daughters testified and Dr. J. Eugene Lammers's [7] deposition, which had been taken the previous day, was read in its entirety. While the Estate concedes that Irene's daughters were not competent to testify regarding the cause of Irene's death, appellee's br. p. 17, it argues that their personal observations contained material information presented at the hearing and supported the trial court's award of damages. We conclude that the trial court's findings and conclusions will be awarded the standard level of deference and will not be set aside unless clearly erroneous because the trial court held an evidentiary hearing and was in a unique position to evaluate the evidence presented. Additionally, the trial court's adoption of the Estate's findings does not change our standard of review because the trial court did make changes to the parties' proposed language. Thus, the trial court's order was not verbatim and we will afford it the standard level of deference.

## II. Summary of Relevant Law

The Medical Malpractice Act (MMA) allows a "patient or the representative of a patient" to bring a malpractice claim "for bodily injury or death." *Goleski v. Fritz,* 768 N.E.2d 889, 891 (Ind.2002) (citing Ind.Code § 34–18–8–1). The MMA was designed to curtail liability for medical malpractice. *Chamberlain v. Walpole,* 822 N.E.2d 959, 963 (Ind.2005). It does not

---

7. Dr. Lammers is a medical expert who specializes in geriatric medicine and reviewed Irene's records at the Fund's request. Appellants' App. p. 127.

create substantive rights or new causes of action and, instead, "merely requires that claims for medical malpractice that are otherwise recognized under tort law and applicable statutes be pursued through the procedures of the MMA." *Id.* The MMA provides that for an act of malpractice occurring after June 30, 1999, the total amount recoverable for an injury or death of a patient may not exceed $1,250,000. I.C. § 34–18–14–3. A qualified healthcare provider[8] is liable for the initial $250,000 of damages, and the remainder of the judgment or settlement amount shall be paid from the Fund. *Id.*

■ The Estate's complaint against North Woods was a wrongful death action or, alternatively, a survival action. While it is well established that a tortfeasor can be held liable pursuant to either the wrongful death statute or the Survival Act, but not both, *Best Homes, Inc. v. Rainwater*, 714 N.E.2d 702, 705 (Ind.Ct.App.1999), Indiana Trial Rule 8(E) permits a party to plead alternative claims in a complaint.

Our Supreme Court has succinctly summarized the Survival Act:

> The Survival Act sets forth a series of rules dictating when particular claims or causes of action may and may not be brought by or against the representative of the deceased party. Sections 1 and 4 of the Survival Act provide that if an individual who has a personal injury claim or cause of action dies, the claim or cause of action does not survive and may not be brought by the representative of the deceased party *unless the individual dies from causes other than those personal injuries.* Ind.Code §§ 34–9–3–1, 34–9–3–4; *Kohn v. Norfolk & W. Ry. Co.*, 966 F.Supp. 789, 791

(N.D.Ind.1997); *Goleski v. Fritz*, 768 N.E.2d 889, 891–92 (Ind.2002).

*Ellenwine v. Fairley*, 846 N.E.2d 657, 660–61 (Ind.2006) (emphasis added). If the deceased party dies of causes other than the personal injuries, "[t]he personal representative of the decedent who was injured may maintain an action against the wrongdoer to recover all damages resulting before the date of death from those injuries that the decedent would have been entitled to recover had the decedent lived." I.C. § 34–9–3–4. All damages recovered from the action "inure to the exclusive benefit of the decedent's estate." *Id.*

■ Alternatively, wrongful death actions can be pursued when "the death is *caused* by the wrongful act or omission of another." I.C. § 34–23–1–1 (emphasis added). These actions are purely statutory, *Estate of Sears v. Griffin*, 771 N.E.2d 1136, 1138 (Ind.2002), and their purpose is not to compensate the decedent's estate for the injury but, instead, to create a cause of action to compensate the decedent's survivors for the loss sustained by the death, *Holmes v. ACandS, Inc.*, 709 N.E.2d 36, 39 (Ind.Ct.App.1999).

Here, the applicable provision of the general wrongful death statute is the AWDS, which is utilized in wrongful death actions that involve an unmarried adult decedent who does not have dependents. I.C. § 34–23–1–2.[9] Pursuant to the AWDS, damages may not include punitive damages or an award for the person's grief but may include an award for "reasonable medical, hospital, funeral, and burial expenses necessitated by the wrongful act or omission that caused the adult person's death" and, additionally, an award no greater than $300,000 for the "loss of the

---

**8.** North Woods is a qualified healthcare provider pursuant to Indiana Code section 34–18–2–24.5. Appellants' App. p. 37.

**9.** The AWDS became effective on January 1, 2000.

adult person's love and companionship." I.C. §§ 34–23–1–2(c)(3)(B), –2(e). Damages in wrongful death actions generally compensate the decedent's relatives "for the loss sustained by reason of the death." *Reeder v. Harper,* 788 N.E.2d 1236, 1242 (Ind.2003). A parent or non-dependent child who wishes to recover pursuant to the AWDS "has the burden of proving that [they] had a genuine, substantial, and ongoing relationship with the adult person." I.C. § 34–23–1–2(f).

We have previously emphasized the differences between wrongful death actions and the Survival Act:

> [A] tortfeasor may be held liable under *either* the Wrongful Death Statute or the [Survival Act], *but not both.* If the victim dies from injuries sustained in the accident, the case falls under the Wrongful Death Statute. *Id.* If, however, the victim dies from unrelated causes, the case falls under the [Survival Act]. *Id.* As noted by the *American International* court:

> > The distinction is important because each statute allows for different recoveries. In a case governed by the survival statute, [the estate] could receive full damages including pain and suffering. Under the wrongful death statute, the estate could recover only [the decedent's] medical and funeral expenses plus any other pecuniary or other loss suffered by her survivors.

> [*Am. Int'l Adjustment Co. v. Galvin,* 86 F.3d 1455, 1457 (7th Cir.1996) ]. In an action brought under the Wrongful Death Statute, a personal representative may recover damages "including, but not limited to, reasonable medical, hospital, funeral and burial expenses, and lost earnings of such deceased person." I.C. § 34–23–1–1. In an action brought under the [Survival Act], "the personal representative of the decedent may recover *all damages resulting before the date of death* from those injuries that the decedent would have been entitled to recover had the decedent lived." I.C. § 34–9–3–4 (emphasis added).

*Best Homes,* 714 N.E.2d at 705 (some internal citations omitted) (emphases in original).

### III. Litigating the Cause of Death

 Initially, it is important to note that, at face value, the parties' positions seem counterintuitive. However, the ultimate motivation for each party's argument—money—supports its respective position. The Fund argues that North Woods's actions caused Irene's death and, therefore, the Estate can only recover excess damages pursuant to the AWDS. The Estate, however, argues that North Woods's actions did not cause Irene's death and, therefore, it can only recover excess damages pursuant to the Survival Act. While it initially seems odd that the Fund would argue in favor of a position implicating one of its healthcare providers in the death of a patient, the Fund believes that the Estate would recover less pursuant to the AWDS than it would pursuant to the Survival Act.

On appeal, the Fund emphasizes that although the underlying settlement established North Woods's liability, it did not specify whether it was awarding damages pursuant to the AWDS or the Survival Act. Because a plaintiff cannot recover damages under both of these statutes, the Fund contends that it should have been allowed to contest the theory of recovery at the damages hearing and argue that North Woods's negligence caused Irene's death. The Fund argues that if it cannot advocate for the proper theory of recovery at a damages hearings, plaintiffs will be motivated to settle their claims with healthcare providers and then assert

whichever theory of recovery will attain the highest damages award from the Fund, contrary to the general purpose of the MMA.

The MMA provides:

If a health care provider or its insurer has agreed to settle its liability on a claim by payment of its policy limits of two hundred fifty thousand dollars ($250,000), and the claimant is demanding an amount in excess of that amount, the following procedure must be followed:

\* \* \*

(5) ... If the commissioner, the health care provider, the insurer of the health care provider, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, the court shall, *after hearing any relevant evidence on the issue of claimant's damage* submitted by any of the parties described in this section, determine the *amount* of claimant's damages, if any, in excess of the two hundred fifty thousand dollars ($250,000) already paid by the insurer of the health care provider. The court shall determine the *amount* for which the fund is liable and make a finding and judgment accordingly. *In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established.*

I.C. § 34–18–15–3 (emphases added). While interpreting a previous version of the MMA that contained the same statutory language emphasized above, we held that

[i]n our view the Statute contemplates that, upon a petition for excess damages, the trial court will determine the

*amount* of damages, if any, due to the claimant, not *whether* the provider is liable for damages.... Commissioner is not permitted to challenge either the liability or proximate cause issues. They are deemed established, pursuant to statute, by the settlement with the health care provider.

*J.L. v. Mortell,* 633 N.E.2d 300, 303 (Ind. Ct.App.1994) (emphases in original). The *J.L.* court held that even though liability and proximate cause were necessarily established, the trial court did have authority to inquire into the compensable nature of the injuries sustained. *Id.* at 304. The *J.L.* court based its holding on *Dillon v. Callaway,* 609 N.E.2d 424, 426 (Ind.Ct. App.1993), which held that the compensable nature of injuries is not decided by a settlement of liability with the healthcare provider.

In *Dillon v. Glover* we held that, generally, "[i]t is axiomatic that, before *liability* can be imposed, there must be proof that the defendant's negligence *proximately caused* the plaintiff's harm. It therefore follows that once *liability* is established, the issue of proximate cause is decided." 597 N.E.2d 971, 973 (Ind.Ct.App.1992) (emphases in original). Because the MMA establishes the Fund's liability if the healthcare provider settles with the plaintiff, *Dillon* held that it necessarily follows that proximate cause is also established. *Id.* at 974.

The gravamen of the Estate's argument is that the Fund could not contest the proximate cause of Irene's death pursuant to the MMA; therefore, the trial court's decision to award damages pursuant to the Survival Act was not clearly erroneous. Conversely, the Fund interprets the above-cited cases to stand for the proposition that the Fund cannot relitigate the issue of its *initial* liability but that it should be able to litigate the theory of

recovery, which, here, hinges on the cause of Irene's death. While the Fund admits that it is liable to the Estate if the Estate suffered damages in excess of $250,000, it argues that the trial court should have been required to determine the proper theory of recovery and that the Fund should have been able to address that issue at the hearing.

The parties' arguments present what appears to be an issue of first impression: While the Fund could not litigate its "liability" pursuant to MMA section 34–18–15–3 because North Woods settled for the statutory limit with the Estate, could the Fund still advocate for the proper theory of recovery? Phrased another way, does the MMA's prohibition against litigating liability prohibit the Fund from contesting the applicable theory of recovery, which may hinge on the proximate cause of a patient's death?

If we were to adopt the Estate's position, in effect, a plaintiff could plead alternative claims against a healthcare provider, settle with the healthcare provider for the statutory limit, and seek additional compensation from the Fund pursuant to whichever claim is the most lucrative. Given that the MMA "was designed to curtail liability for medical malpractice[,]" *Chamberlain,* 822 N.E.2d at 963, this could not have been the legislature's intent.

Furthermore, we have previously held that the Fund "is not required to pay legally non-compensable damages." *Rimert v. Mortell,* 680 N.E.2d 867, 871 (Ind. Ct.App.1997). Assume for argument's sake that Irene died as a direct result of North Woods's negligence and, therefore, the Estate was legally entitled to recover under the AWDS. If we hold that the Estate can plead alternative claims and then choose a theory of recovery at the damages hearing, the Fund could be forced to pay the Estate damages to which

the Estate is not legally entitled. For example, in this hypothetical, the Estate would pursue damages pursuant to the Survival Act even though Irene died as a direct result of North Woods's negligence. In that scenario, the Estate would obtain damages that it had no right to recover. This violates the principles of equity and public policy and could not have been the legislature's intent.

For these reasons, because the parties' underlying settlement agreement did not specify whether it awarded damages pursuant to the AWDS or the Survival Act, the Fund should have been allowed to contest the theory of recovery at the damages hearing. And because recovery under the AWDS or the Survival Act hinges on whether the victim dies as a direct result of the tortfeasor's actions, the Fund should have been allowed to present evidence regarding the cause of Irene's death. While we acknowledge that *Dillon* held that proximate cause is necessarily established because the MMA provides that a settlement establishes liability, the plaintiff in *Dillon* only advanced one claim against the healthcare provider—wrongful death. 597 N.E.2d at 973. Thus, the plaintiff in *Dillon* could not have argued for another theory of recovery at the damages hearing, and the *Dillon* court was not confronted with the issue before us today. Where, as here, the plaintiff asserts alternative claims against a healthcare provider and the resulting settlement does not specify which claim the damages cover, we hold that the Fund is allowed to contest the proper theory of recovery, which, in this case, hinges on the cause of the victim's death.

### IV. Evidence at Hearing

As previously noted, the trial court ordered that the Fund "is precluded from offering any evidence contesting liability or causation at the damages hearing." Ap-

pellants' App. at 55. However, the Fund hired Dr. Lammers to review Irene's medical records, the parties deposed him the day before the damages hearing, and his deposition was admitted at the hearing. After reviewing Irene's medical records, Dr. Lammers concluded that he would have listed Irene's cause of death as "acute renal failure due to dehydration." *Id.* at 139. He noted that the pressure ulcers were "a major contributing factor in [Irene's] inability to take in fluid and nutrition and in her increased need for fluid and nutrition." *Id.* at 140. Dr. Lammers opined that he would have listed "dementia, pressure ulcers, [and] Parkinson's, in no particular order" as "significant factors" contributing to Irene's death. *Id.* at 139–140.

The Fund also entered into evidence a settlement report submitted to the State Department of Insurance. Ex. J. The report, which declared the amount of the settlement between North Woods and the Estate, listed Irene's injuries as "fractured hip, pressure ulcers, and *death.*" Appellants' App. p. 53 (emphasis added). While the Fund acknowledges that "the settlement [agreement] and release did not expressly indicate which of [the Estate's] alternate legal theories the healthcare provider was establishing," the Fund argues that the report proves that the Indiana Department of Insurance believed that it was providing damages for Irene's "death." Appellants' Br. p. 17.

The Fund also admitted into evidence the Estate's IH–6 Indiana Inheritance Tax Return (IH–6 return). The Estate's IH–6 return, which had been filed with the probate court on February 16, 2005, did not list the Estate's pending action against North Woods as an intangible asset. Appellants' App. p. 67–70. Because the Estate did not list its action against North Woods on the form,[10] the Fund argues that the "omission of the pending claim against North Woods ... was permissible *only* if the claim was one for wrongful death." Appellants' Br. p. 18 (emphasis in original). Therefore, the Fund emphasizes that the Estate's own actions proved that the settlement with North Woods was for the wrongful death claim and that the Fund should only be required to compensate the Estate for additional damages pursuant to the AWDS.

We have already held that because the underlying settlement did not specify whether it awarded damages pursuant to either the AWDS or the Survival Act, the Fund should have been allowed to advocate for the proper theory of recovery. While it may initially appear that the Fund was precluded from producing such evidence because of the trial court's pretrial order, such was not the case. Notwithstanding the probative evidence summa-

---

**10.** Pursuant to the Indiana Estate Tax,

> the value of a resident decedent's Indiana gross estate equals the total fair market value on the appraisal date of personal property and real estate that had an actual situs in Indiana at the time of the decedent's death and *all intangible personal property wherever located that is included in the decedent's gross estate for federal estate tax purposes.*

Ind.Code § 6–4.1–11–2(c) (emphasis added). The Probate Code provides that personal property includes "interests in ... choses in action." Ind.Code § 29–1–1–3. Because the personal representative of the decedent's estate brings a survival action on behalf of an estate and all recovered damages "inure to the exclusive benefit of the decedent's estate[,]" I.C. § 34–9–3–4, a pending survival action is property of the decedent's estate and should be listed on the IH–6 return. Conversely, wrongful death actions compensate the decedent's survivors for the loss sustained by the decedent's death, *Holmes,* 709 N.E.2d at 39, and recovered damages that inure to the benefit of the decedent's survivors need not be listed on the IH–6 form.

rized above, the Fund admitted at oral argument that it proffered all of its evidence regarding the proper theory of compensation. Consequently, although the trial court erred by issuing a pretrial order precluding evidence of causation, any resulting error was harmless because, as the Fund conceded, its evidence was admitted.

■ In light of this conclusion, we will uphold the trial court's judgment if the evidence supports the findings and the findings support the judgment. As previously noted, we will not set aside the trial court's findings or judgment unless they are clearly erroneous. The Fund argues that it presented sufficient evidence at the hearing that the pressure ulcers Irene sustained as a result of North Woods's negligence did, in fact, cause her death. Appellants' Br. p. 21. However, the Estate presented Irene's death certificate and an affidavit from Dr. Charles Marler, Irene's treating physician, attesting that Irene died from "acute renal failure secondary to severe hypernatremia" and that "[t]hese events were acute and in no way related to the care and treatment at Northwoods [sic] Village." Ex. 2; Appellants' App. p. 100–02.

The Estate criticizes the Fund's view of the evidence and argues that the settlement report submitted to the State Department of Insurance is irrelevant because, as the Fund's witness admitted at trial, it was prepared by a "third party administrator" who was not a party to the settlement. Tr. p. 58. The Estate also emphasizes that it amended its IH–6 tax return on October 28, 2006, to include the settlement with North Woods as an intangible asset. In sum, the Estate requests that we show deference to the trial court and find that its conclusion that Irene died from causes other than North Woods's negligence and its decision to award dam-

ages pursuant to the Survival Act were not clearly erroneous.

After reviewing the evidence, we do not find the trial court's finding of fact that North Woods's negligence did not cause Irene's death to be clearly erroneous. The record contains evidence supporting that conclusion, and our review of the evidence does not leave us with a firm conviction that a mistake has been made. Because that finding was not clearly erroneous, it was proper for the trial court to award the Estate damages pursuant to the Survival Act.

*V. Amount of Damages*

■ The Fund argues that even if we conclude that the trial court did not err by awarding the Estate damages pursuant to the Survival Act, the $1,250,000 award was excessive. In a survival action, "the personal representative of the decedent may recover all damages resulting before the date of death from those injuries that the decedent would have been entitled to recover had the decedent lived." I.C. § 34–9–3–4. We will not reverse a damage award if the award is within the scope of the evidence, and we will not reweigh the evidence or judge the credibility of the witnesses. *Randles v. Ind. Patient's Comp. Fund,* 860 N.E.2d 1212, 1230 (Ind. Ct.App.2007).

■ A common question in personal injury actions is how much money reasonably compensates a plaintiff for his injuries, pain, and suffering. *Zambrana v. Armenta,* 819 N.E.2d 881, 891 (Ind.Ct. App.2004). While no particular degree of mathematical certainty is required in determining damages, the award must be within the scope of the evidence. *Id.* "A damage award is not excessive unless the amount cannot be explained upon any basis other than prejudice, passion, partiality, corruption, or some other improper element." *Id.* at 890.

■ Irene's medical bills totaled $95,878.22. Appellants' App. p. 112. In addition to that amount, the trial court awarded the Estate $325,000 for Irene's hip fracture, $625,000 for her heal injury and the subsequent disfigurement, and $725,000 for her coccyx injury and the subsequent disfigurement. *Id.* at 16–17. The trial court included Irene's pain and suffering in these amounts. While the damages totaled $1,770,878.22, the trial court lowered the award to $1,250,000 pursuant to Indiana Code section 34–18–14–3. After deducting the $250,000 that the Estate had already recovered from North Woods, the trial court ordered the Fund to pay the Estate $1,000,000 in additional compensation.

The Fund argues that the Estate had the burden of establishing the amount of damages and that the evidence presented at the hearing does not support the award. The Fund stresses that Irene was an eighty-two-year-old woman who suffered from dementia before North Woods's negligence. It emphasizes that Irene was placed under general anesthesia during the debridement procedures to minimize the pain. In sum, the Fund argues that the Estate's evidence was insufficient to support the damages award.

The Estate emphasizes the graphic nature of Irene's wounds and the pain, general discomfort, and limited mobility that she endured as a result of North Woods's negligence. Because of North Woods's negligence, Irene fell asleep in bed without wearing the adult brief she always wore. She began to urinate and slipped on urine that had spilled onto the floor, causing her to hit her head on a nightstand and break her hip. Irene lay on the floor in urine for an undetermined amount of time until the staff discovered her. As a result of the fall, Irene's head wound required three staples and her hip fracture required surgery.

Following the surgery, Irene initially appeared "alert, fairly bright-eyed." Tr. p. 27. However, after her return to North Woods, Irene developed Stage IV pressure ulcers, which showed exposed muscle and bone.[11] Irene's left heel turned black and her wounds secreted drainage and emitted a foul odor. Given the severity and chronic nature of the wounds, Irene endured ten debridement surgeries on her heel and nine debridement surgeries on her coccyx within a three-month period. While the Fund argues that Irene was under anesthesia during these surgeries, that argument is of no moment.

Irene's mobility and independence were virtually eliminated after her fall. Although Irene had been mobile before the accident, as a result of the injuries she was confined to a wheelchair, unable to feed herself, and required constant supervision. *Id.* at 30–32. While the Fund argues that the damages award is excessive because Irene was an eighty-two-year-old woman who suffered from dementia, we decline the Fund's invitation for us to lower the damages award simply because of Irene's age and mental acuity.

While we acknowledge that it impossible to place an exact dollar amount on pain, suffering, and the extent of an injury, we find the trial court's damages award to be within the scope of the evidence. In fact, the trial court valued the total amount of damages at $1,770,878.22 but lowered that amount by approximately $500,000 to the MMA's statutory maximum. In sum, Irene's injuries caused immense pain and

---

11. Photographs of Irene's wounds can be seen on pages 96–102 of the Estate's appendix.

suffering, extremely limited mobility, and a need for constant supervision and assistance. In light of the evidence presented at the damages hearing, we cannot say that the trial court's award was excessive.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and CRONE, J., concur.