**In re the General Power of Attorney of Xenia S. MILLER.**

**In re the J. Irwin Miller Trust Agreement Dated September 25, 1999, as Amended.**

**Hugh Th. Miller, Appellant–Interested–Party,**

v.

**William Irwin Miller and Sarla Kalsi, Appellees–Attorneys–in–Fact.**

No. 03A01–0912–CV–586.

Court of Appeals of Indiana.

Sept. 30, 2010.

Kathleen Hart, C. Daniel Yates, George T. Patton, Jr., Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellant.

Richard A. Smikle, Kristine J. Bouaichi, Brian J. Paul, Ice Miller LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAKER, Chief Judge.

*What's past is prologue. . . .* [1]

Xenia and Irwin Miller were extraordinary individuals who did everything in their power to enrich their community, support their family, and better society as a whole. After Xenia became incompetent, her attorneys in fact managed her financial resources as she had always done—with priority given to community over self. After a beneficiary of Xenia's

---

1. William Shakespeare, *The Tempest* act 2, sc. 1.

estate objected to the way in which the attorneys in fact managed her funds—with an eye towards philanthropy and altruism rather than maintaining and increasing Xenia's own wealth—the trial court concluded that the attorneys in fact had committed no breach of duty and had instead merely endeavored to respect Xenia's wishes and values. We agree.

Appellant–Interested–Party Hugh Th. Miller (Hugh) appeals the trial court's order overruling Hugh's objections to the accountings filed by appellees-attorneys-in-fact William Irwin Miller (Will) and Sarla Kalsi (Sarla) and releasing Will and Sarla from all liability in their roles as Xenia S. Miller's (Xenia) attorneys in fact (AIFs) and co-trustees. Hugh also argues that the trial court erred by denying his request and granting the AIFs' request for attorney fees.

We find that the AIFs acted in Xenia's best interest. And although Hugh has waived the arguments related to the trust, we find that the co-trustees likewise acted within the scope of their fiduciary duties. Finally, we conclude that although the trial court properly denied Hugh's request for attorney fees, it erred by awarding the AIFs' requested fees. Therefore, we affirm in part and reverse in part.

### FACTS [2]

#### The Miller Family and its Philosophy

J. Irwin Miller ("Irwin") and Xenia were married for well over fifty years. They had five children: Margaret, Catherine, Elizabeth, Hugh, and Will, who were all adults in their fifties and sixties at the time of the relevant events herein.

Over the decades of their marriage, Irwin and Xenia amassed a considerable fortune. As of July 1996, Irwin estimated that their estate, when combined with that of Irwin's recently deceased sister, was worth approximately $173 million. Irwin and Xenia supported a number of local business endeavors in Columbus, invested in local companies, and gave generously to a variety of charitable organizations.

In 1996, Irwin wrote a letter to his five children. He explained that the ways in which he and Xenia had decided to use and invest their assets were "not always based on the simple accumulation of money, but rather upon considerations of what we believed to be the best long-term interests of our family members and of the community and area in which we lived." Appellant's App. p. 802. He went on to explain the general philosophy that he and Xenia lived their lives by, and according to which they had structured their estate plan:

> Of all the things we can "leave to you," money seems to us to be the least important. The most important thing parents can do for their children is to try as hard as they can to leave them a personal example in the kinds of lives they live....
>
> *       *       *
>
> In the early 1960s, we gave each of you enough assets in your own names to assure you of a reasonable ability to do with your lives what you would find most fulfilling. Each of you assumed full control of these assets when you reached the age of majority and have made your own choices ever since. We have also paid for whatever education each of you sought through the graduate school level. We believe these gifts ful-

**2.** We held oral argument in Indianapolis on September 8, 2010. We thank counsel for their truly superb oral and written presentations. The oral argument, in particular, was an example of stellar advocacy on both sides, and we thank counsel for such an interesting, respectful, and useful discussion.

filled our financial responsibilities to you as parents.

\*　　\*　　\*

Putting all this together … we have not lived and worked primarily to maximize your inheritance any more than our ancestors lived and worked to maximize our inheritance. We have lived and worked to do our best to help prepare you for the lives and careers of your choice. We have worked and lived to make a constructive contribution to our community, church, and nation. And— we have lived our own lives the way we wanted to live them, and have had a good time so doing.

*Id.* at 803–06.

### The Miller Family Estate Plan

In 1995, Irwin gave Xenia and Xenia gave Irwin each other's power of attorney to act in his or her stead in all matters. At the same time, both named Will and their financial advisor of thirty years, Sarla Kalsi, as their attorneys in fact (AIFs). Each authorized the AIFs to "take all action with respect to [Xenia or Irwin's] property and affairs as [either of them] could take as fully and with the same effect as if [they] were competent and acting on [their] own behalf. . . ." *Id.* at 789. The AIFs were directed to "exercise the powers granted hereunder in a fiduciary capacity with due care and in good faith." *Id.*

On August 16, 2004, Irwin passed away. It is undisputed that at that time, Xenia was incapacitated. At that time, therefore, Will and Sarla assumed their duties as Xenia's AIFs. They were also serving as the co-trustees of the J. Irwin Miller Trust, a duty they had assumed after Irwin died. Xenia died on February 19, 2008. Between August 2004 and February 2008, Will and Sarla each spent thousands of hours, without pay, serving in their roles as Xenia's AIFs.

### Miller Family Properties: 608

Irwin grew up living in the Historic Irwin Home and Gardens ("608"), often referred to as the "608 property" because of its Columbus street address. In later years, 608 was owned by Irwin's sister. When she died in 1996, Irwin and Xenia inherited a joint life estate in the gardener's cottage and greenhouses, as well as outright ownership of all of the furnishings and art in the main home, which were valued at over $1 million. The balance of the property, including the main residence itself, would pass to a family foundation unless purchased by a family member. Xenia and Irwin very much wanted 608 to remain in the family so that it would be available for family visits. Additionally, Xenia wanted to maintain the family tradition of opening the gardens to the public on weekends, a tradition dating back to 1969. They were reluctant to purchase it themselves, however, for estate tax reasons.

After considering several alternatives, Irwin asked Will to purchase the property. Will agreed, and in 1999 he paid the home's appraised value—approximately $900,000—and purchased 608, with court approval. An attorney drafted a memorandum that memorialized an understanding between Will and his parents that Irwin and Xenia could continue to use 608 during their lifetimes in exchange for their agreement to continue to pay all maintenance costs, which amounted to approximately $200,000 per year. Irwin signed the memorandum; Xenia did not.

Although Will nominally owned 608, while Irwin and Xenia were still alive, it was his home in title only. It did not serve as his personal residence; he did not live there. As he later testified, Will agreed to "take a million dollars of [his]

cash, buy [the property] . . . and then have absolutely no control over it." Tr. p. 455. Will understood that this would be a bad investment and that the home was expensive to maintain, but he agreed to do so to help his parents. Will and Hugh both testified that by agreeing to this plan, Will was taking a family "burden" off of his father's shoulders. *Id.* at 375, 434, 451.

### Miller Family Properties: 2760

A second home ("2760"), also located in Columbus, served as the Millers' actual residence for over fifty years. This property has been declared a National Historic Landmark and is considered to be one of the most significant homes and residential landscape designs of the past century.

Between 2004 and 2007, Will and Sarla deferred major maintenance expenditures on 2760 because Hugh was threatening to sue, and Will thought it best to focus on seeking a timely resolution to Hugh's objections. As a result, three of the Miller children voiced concerns to Will and Sarla that the residence was in poor condition and threatened Xenia's safety and quality of life. Will later admitted that 2760 had become "shabby" and "would have appalled" Irwin and Xenia had they still been alive and competent, respectively. Tr. p. 861–62, 868.

In 2007, after the National Trust and Historic Landmarks expressed interest in the property, Will and Sarla decided to hold a meeting with a group of experts to determine what to do with 2760 after Xenia passed away. It was estimated that endowing the maintenance of 2760 and its garden would cost approximately $10 million.

Will and Sarla decided to put 2760 in trust. While Xenia was still alive, she was the beneficiary of the trust, permitting her to continue to live at the residence. Upon her death, the Miller siblings could either disclaim their share of 2760 to a charitable entity or take cash equivalent to the appraised value of their share. After Xenia's death, four of the five siblings disclaimed their interests in favor of the home's ultimate owner, the Indianapolis Museum of Art (the IMA); Hugh declined to do so and took approximately $187,000 as his share of the home.

Beginning in 2007, Will and Sarla decided to rehabilitate 2760 to make it more attractive to the IMA. They began a number of projects on the property, spending nearly $400,000 to replace trees on the property, $55,000 to repair a pool, and $144,000 for landscaping fees.

### Miller Family Properties: Muskoka

"Muskoka" is the name of the Miller family vacation property in Ontario, Canada, where the Miller family has spent its summers for the last 120 years. Muskoka is located on a lake and comprised of nearly 570 acres of land and includes four houses, four boathouses, and other structures. At the time of Xenia's death, the value of the property was estimated to be $25,390,524 (U.S.).

Irwin and Xenia viewed Muskoka as a "spiritual investment," meaning that it was "a place that has had a unique capacity to refresh and restore the spirit." AIF Ex. 16. Because Irwin and Xenia wished to treat it as a spiritual investment rather than a financial one, the property was never divided up.

> If Muskoka is treated as a financial inheritance, your aunt, your mother, and I fear that . . . you and your children will ultimately all lose it. On the other hand, if you continue to regard it as a "spiritual asset," if you cooperate, defer to each other, are concerned always to help each other and pay your "fair" share—*or more*, then Muskoka will be a "spiritual" resource to you as it has been

to those of the four preceding generations.

*Id.* (emphasis original). When Irwin died, Xenia became the sole owner of their undivided half-interest in Muskoka and the primary beneficiary of The CMT Muskoka Trust, which held the other undivided one-half interest. That Trust required the Millers to pay for the maintenance of the property so long as either of them lived. After Irwin's sister's death, Xenia and Irwin paid all maintenance expenses for the property, and after Irwin's death, the AIFs continued to pay all maintenance expenses out of the family funds.

During Irwin's lifetime, he took on a program of heightened maintenance because he wanted to leave the property in pristine condition. Thus, he and Xenia spent nearly $1 million on the property every year. Xenia did not use a substantial portion of the property—e.g., the tennis court—but paid for repairs maintenance of all of the property because she wanted her family and guests to be able to use and enjoy it. Tr. p. 813–16, 835–37. After Xenia's death, the AIFs continued to spend approximately $1 million per year to maintain Muskoka.

### Miller Family Properties: IMC Advisors, LLC

In the 1950s, Irwin and his sister formed Irwin Management Company, Inc. (IMCo), which served as the Millers' private family office, managing investments and real estate, paying bills, keeping accounting records, and preparing tax returns. In 1984, after earning a BA from Yale and an MBA from Stanford, Will came back to Columbus and took over IMCo at Irwin's request. Since 1968, Sarla, who earned an MBA from Columbia, has been a trusted financial advisor of the Miller family and an employee of IMCo.

By the late 1990s, IMCo faced an uncertain future, inasmuch as need for its services would be greatly diminished after the deaths of Irwin and Xenia. The Millers were concerned that Sarla would leave IMCo but very much wanted her help in settling their estates. To give her an incentive to stay, the Millers formed IMC Advisors, an investment advisory firm registered with the Securities & Exchange Commission (SEC). IMCo subsidized the new firm's startup costs in exchange for Sarla's agreement to relinquish her long-term compensation plans with IMCo and continue as a full-time IMCo employee. Sarla benefited from this arrangement because she had a new platform to develop a broader client base to provide her with income after IMCo was dissolved.

IMC Advisors was owned by Sarla, who had a 45% stake, Don Michaels (another IMCo employee), who had a 40% stake, and IMCo, which owned the remaining 15%. Sarla, Don, and IMCo each made an initial capital contribution of $1,000. Irwin agreed that IMCo would provide a maximum subsidy of $3.9 million to IMC Advisors over three years, at which time Sarla and Don hoped to be able to begin reimbursing IMCo for these expenses.

In 2004, shortly after Irwin's death, Don attended an SEC compliance conference and learned that IMCo could now be subject to SEC oversight because of its 15% ownership stake in IMC Advisors. The Millers, who were very private about their personal finances, had always deliberately avoided maintaining business relationships that might subject their private financial affairs to public disclosure. Don brought his concerns to Will, who agreed that IMCo's ownership stake in IMC Advisors posed an inappropriate risk and would have been contrary to Xenia and Irwin's wishes. At the end of 2004, therefore, Will decided to redeem IMCo's interest in the firm, which, under the terms of the operating agreement, could be done at its capital

contribution of $1000. In 2008, Sarla concluded that she could not give IMC Advisors the attention it required and cashed in her interest in IMC Advisors for $1000.

## The Litigation

Hugh raised a number of complaints and made multiple threats to sue during the years in which Will and Sarla were acting as Xenia's AIFs. In response to those complaints, on July 31, 2007, Will and Sarla filed an intermediate accounting and sought a release from all liability with respect to their acts as Xenia's AIFs. The AIFs filed a general, public accounting and also provided a private, detailed accounting to the Miller siblings. Additionally, in a trust action, Will and Sarla filed an intermediate accounting and sought a release from all liability with respect to their roles as co-trustees.

Hugh objected to the accountings. The trial court consolidated the trust and AIF actions, electing to hold a single hearing on all pending issues. On July 10, 2008, the trial court approved the intermediate accountings. Hugh filed a motion to reconsider, which the trial court denied as to the trust accounting but granted as to the power of attorney accounting. The trial court vacated the approval of that accounting, gave Hugh more time to conduct discovery, and gave the AIFs until November 30, 2008, to provide final accountings covering the entire period up to Xenia's death. The AIFs complied and again filed general public and detailed private accountings.

Hugh filed a motion to compel more detailed accountings. The parties eventually resolved his motion by agreed order, stipulating that the AIFs would open all relevant books and records for inspection and make the Millers' accountant available to answer Hugh's questions. The AIFs complied with the agreed order.

Having had the opportunity to examine all of the relevant documents, Hugh filed his final objections to the AIFs' actions on May 1, 2009. Specifically, Hugh argued that the AIFs had violated their fiduciary duties by (1) spending Xenia's money on upkeep of 608, which was owned by Will; (2) letting 2607 fall into disrepair until the IMA expressed interest in the property, and subsequently spending too much of Xenia's money to rehabilitate the property; (3) spending Xenia's money, and too much of it, to maintain Muskoka; (4) cashing in IMCo's 15% share in IMC Advisors for only $1,000 when it had invested nearly $4 million in the company; and (5) failing to provide sufficiently detailed accountings.

In June and July 2009, the trial court held four days of hearings on Hugh's objections. Hugh, the AIFs, the Millers' accountant, financial advisor, and attorney, and one of Hugh's sister testified. Every witness but Hugh testified that the AIFs had acted with due care and good faith in the exercise of their fiduciary powers.

On November 16, 2009, the trial court issued two rulings in favor of Will and Sarla, one as to their actions as AIFs and one as to their actions as co-trustees, approving their accountings and releasing their liability. Among other things, the trial court found as follows:

> [Irwin] and [Xenia] did not live their lives with the purpose of building or increasing their wealth or power, but to provide blessings to many. They lived their lives with a sense of charitable responsibility to their community, in a large sense, and to their family based upon a choice to live up to the blessings and obligations bestowed upon them from the legacy which had been left them by prior generations.... [T]heir aims seem to have been to preserve and build wealth only in order to do good and great things to benefit all. They specifically showed a desire to use their

wealth to do more than preserve, maintain, or do some sort of objective cost benefits analysis based upon financial considerations alone. Therefore in order to adequately appraise the behavior of the fiduciaries in this case the appropriate perspective for review would be to ask whether the fiduciaries carried out the obvious intent of Mr. [a]nd Mrs. Miller's life mission. That life mission could, in the opinion of the court, be best summed up by asking, whether the world was left in a better condition because of the fact that these outstanding persons had passed through this world. Ordinary financial or legal analysis cannot be used as the sole benchmark to measure such extraordinary people or the acts of those who attempted to act in their place.

Appellant's App. p. 23–24. The trial court also ordered Hugh to pay a portion of the AIFs' attorney fees. Hugh now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

The trial court herein propounded extensive and thorough findings of fact, together with the lengthy conclusions of law it reached based on those facts. When reviewing a judgment based upon findings, we first determine whether the evidence supports the findings, and then whether the findings support the judgment. *Atterholt v. Robinson*, 872 N.E.2d 633, 638–39 (Ind.Ct.App.2007). We defer to a trial court's factual findings, and will reverse only if they are clearly erroneous. *Id.*

We do not, however, defer to the trial court's conclusions as to the applicable law. *Id.* Instead, we review issues of law—including issues of statutory interpretation—de novo. *Schmitter v. Fawley*, 929 N.E.2d 859, 862 (Ind.Ct.App.2010). " 'The rules of statutory construction require courts to give the words of a statute their plain and ordinary meaning unless the statute otherwise provides definitions, or unless the construction is plainly repugnant to the intent of the legislature.' " *Id.* (quoting *Ind. Bureau of Motor Vehicles v. Orange*, 889 N.E.2d 388, 390 (Ind.Ct.App. 2008)).

### II. Power of Attorney

■ A power of attorney creates a fiduciary relationship between a principal and her agent, or attorney in fact. *In re Estate of Rickert*, 934 N.E.2d 726, 729–30 (Ind.2010); *see also* Ind.Code § 30–5–6–3 (requiring that the AIF "shall exercise all powers granted under the power of attorney in a fiduciary capacity"). Specifically, a power of attorney "grants authority to an attorney in fact or agent to act in place of a principal. . . ." I.C. § 30–5–2–7.

### Real Estate Expenditures: The Millers' Philanthropy

With respect to the real estate expenditures made by the AIFs, the parties' primary dispute essentially amounts to a disagreement about what it means to "act for the benefit" of Xenia. The trial court crystallized the dispute as follows:

The fundamental disagreement before the Court [regarding Muskoka] is the definition of what was of benefit to [Xenia]. Hugh Miller believes 'benefit' is defined narrowly as something that accrues monetary value to her or meets her physical needs. Will Miller believes 'benefit' has a broader definition, beyond accruing value to [Xenia] and meeting her physical needs, to include fulfilling her wishes and plans.

Appellant's App. p. 77. Hugh does not disagree with this assessment. Indeed, he argues that because the various real estate expenditures did not directly benefit Xenia—meaning, accruing monetary value to her or meeting her physical needs—the

AIFs should not have been permitted to use her funds in these ways.

■ Indiana Code section 30–5–6–2 explains that an AIF "shall use due care to *act for the benefit of the principal* under the terms of the power of attorney." (Emphasis added). And as noted above, an AIF is the person "designated to *act for the principal* " under a POA. I.C. § 30–5–2–2 (emphasis added). This statutory language does not in any way state or imply that the only way in which an AIF can satisfactorily act for the principal and for the benefit of the principal is to limit himself to acts that accrue or preserve the principal's finances or meet her physical needs.

We find certain language in the Uniform Power of Attorney Act to be instructive on these issues. Section 114(a) provides that an AIF shall "act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest . . ." The commentary elaborates upon the need for this distinction:

> Establishing the principal's reasonable expectations as the primary guideline for agent conduct is consistent with a *policy preference for "substituted judgment" over "best interest" as the surrogate decision-making standard that better protects an incapacitated person's self-determination interests.* The Act does not require, nor does common practice dictate, that the principal state expectations or objectives in the power of attorney. In fact, one of the advantages of a power of attorney over a trust or guardianship is the flexibility and informality with which an agent may exercise authority and respond to changing circumstances. . . .

>    *    *    *

> . . . [A]n agent has a duty to preserve the principal's estate plan only to the extent the plan is actually known to the agent and only if preservation of the estate plan is consistent with the principal's best interest.

Unif. Power of Attorney Act § 114 Cmt. (emphasis added) (internal citations omitted) (citing Unif. Guardianship & Protective Proc. Act § 314(a) (requiring that "[a] guardian, in making decisions, shall consider the expressed desires and personal values of the ward to the extent known to the guardian")).

■ When a person becomes incapacitated and has selected an AIF to act on her behalf, she should feel secure that her AIF will act *for* her. The AIF should endeavor to act as the principal could—and would—act were she not incapacitated. If the principal has chosen to live her life—and spend her money—in a certain way, she has the right to know that while she is still alive and her financial resources allow, those resources will continue to be spent in a way that comports with her desire and values. That she is incompetent does not alter her basic philosophy about life, family, and money, and while she is still alive, her AIF should try to honor that philosophy if at all possible.

■ At oral argument, Hugh relied heavily on this court's opinion in *In re Supervised Estate of Scholz*, 859 N.E.2d 731 (Ind.Ct.App.2007). In *Scholz*, one of the testator's children (Ken) was a tenant farmer on the testator's land during her lifetime. Ken and his mother reached an agreement while she was alive that he would pay her the annual sum of $4,000 to rent the land, which was far below the fair market value of approximately $12,000 per year at the time of the testator's death. After she died, Ken was named her personal representative. He received a life estate in the farmland and continued to pay only $4,000 in rent for the farmland.

After one of his siblings objected to the arrangement, the trial court found that the arrangement was improper. This court agreed, first concluding that Ken had breached his fiduciary duty to maximize estate income by engaging in self-dealing. *Id.* at 736.

Hugh argues that as in *Scholz,* the AIFs here breached their fiduciary duty to maximize Xenia's estate income. We cannot agree. Initially, we note that whereas *Scholz* concerned management and distribution of a testator's estate, the instant appeal concerns the responsibilities of the AIFs during Xenia's lifetime. We disagree, for reasons stated herein, with Hugh's contention that the AIFs had a duty to maximize Xenia's income. Furthermore, we note that in response to an argument made by Ken that one of his siblings had agreed to the rent arrangement, the *Scholz* court emphasized the importance of the testator's intent:

> [W]hen construing the language of a will, we seek to determine the intent of the testator, and we do that by looking at the language used in the will itself. Mrs. Scholz intended that all the surviving siblings share equally in the annual equitable income from the farm. Neither the law nor the will authorize Ken, as personal representative, to enter into an arrangement for his own benefit based upon the consent of himself and one sibling when that arrangement is to the detriment of a third sibling's interest.

*Id.* at 737. Here, as in *Scholz,* the touchstone of the relationship between Xenia and her AIFs, and of the way in which the AIFs carry out Xenia's business during her incompetency, is Xenia's intent. Thus, nothing in *Scholz* compels a different conclusion than the one reached by the trial court herein.

Hugh argues vigorously that the trial court erred by stating that "ordinary financial or legal analysis cannot be used as the sole benchmark" to resolve these issues and by conducting a subjective inquiry to determine the "life mission" of the Millers. Appellant's App. p. 23–24. In other words, Hugh contends that the trial court failed to follow the relevant statutes when it wove this imprecise inquiry into its analysis and conclusion that Xenia had designated the AIFs to be her alter egos and intended for them to act as she could and would, were she not incompetent. We disagree. It is apparent to us that the principal's intent, as manifested by the principal's prior conduct and course of dealing, is an essential—perhaps *the* essential—ingredient of the agency relationship established by a written POA. Neither the AIFs nor the trial court erred by looking at Xenia's life and past actions to determine her intent as set forth in the POA.

Here, it is undisputed that Xenia and Irwin Miller chose to spend a substantial portion of their wealth to enrich their community and provide for their family. Although these expenditures did not benefit them financially—indeed, the upkeep on 608, 2607, and Muskoka was a significant financial detriment to the Miller Estate— Xenia and Irwin's altruism and philanthropy benefited them in other ways and were inextricable from their world view and their value system. It is evident from the actions of Irwin while he was still alive— and acting as Xenia's AIF—and from the letters they wrote to their children that they placed far greater value on contribution to their community than on maximizing their own personal wealth and their children's inheritance.

In her POA, Xenia empowered the AIFs "[t]o take all action with respect to my property and affairs as I could take as

fully and with the same effect as if I were competent and acting on my own behalf. . . ." Appellant's App. p. 91; *see also DLZ Ind., LLC v. Greene County*, 902 N.E.2d 323, 327 (Ind.Ct.App.2009) (holding that we review the interpretation of language in a legal document de novo). It is undisputed that Xenia spent her money with the hope of having the "effect" of the betterment of society and her family's lives. The AIFs believed that the best way in which to honor her wishes, uphold her values, and act *for* her was to continue to manage her funds with these same goals in mind. We do not believe that the trial court erred by finding that in making these carefully considered decisions,[3] the AIFs were, in fact, acting for Xenia's benefit. In other words, the trial court did not err by finding that the AIFs did not breach their duty to Xenia by managing her funds with aims aside from the maximization of her own wealth.

### Real Estate: 608 Expenditures

■ Hugh argues that the trial court should have found that the AIFs' decision to spend Xenia's money to maintain 608 was a breach of their fiduciary duties to her and ordered that the amount spent—$908,581.74—be refunded to Xenia's estate. Among other things, Hugh contends that these maintenance expenses inured to Will's benefit and, consequently, were fraudulent.

This court has recently explained that a presumption of fraud or undue influence "is now conditioned upon the attorney-in-fact's actual use of the power-of-attorney to effect the questioned transaction for his or her benefit." *In re Estate of Compton,* 919 N.E.2d 1181, 1187 (Ind.Ct.App.2010), *trans. denied.* Hugh argues that with respect to 608, the presumption applies because Will owned the property. Hugh argues, therefore, that Will used the power of attorney to spend Xenia's money maintaining the property and benefited from that action as the owner of the property.

Even if we assume solely for argument's sake that the presumption of fraud applies in this instance, we find that Will has rebutted the presumption. *See Estate of Rickert,* 934 N.E.2d at 730–31 (holding that if fraud or undue influence are presumed, the burden then shifts to the dominant party to demonstrate that the transaction was "voluntary and fair"). The POA did not prohibit the AIFs from engaging in transactions that gave them *some* benefit. *See* Unif. Power of Attorney Act § 114 cmt. (explaining that "[t]he public policy which favors best interest over sole interest as the benchmark for agent loyalty comports with the practical reality that most agents under powers of attorney are family members who have inherent conflicts of interest with the principal arising from joint property ownership or inheritance expectations"). And in any event, there is no evidence that, in fact, Will benefited as a result of the 608 expenditures. He bought 608 only because his father had asked him to, he viewed it as a bad investment but retained it for the sake of his parents, neither he nor his family lived there, and at the time of the hearing he was just hoping to sell the residence for the price he had paid for it a decade before. The AIFs continued to spend approximately $200,000 per year on 608 only because it was what they reasonably be-

---

3. We note that the record reveals that the AIFs sought advice of counsel and recommendations of tax experts. They reviewed Irwin's letters and other writings, and studied the Millers' historical spending patterns. They consulted with Will's siblings and hired a facilitator to smooth family discussions. They made budgets and got estimates on large projects. Thus, we can only conclude that they acted with extraordinary care in deciding how to manage Xenia's funds.

lieved Xenia would want them to do and what she and Irwin had historically done.

Additionally, Hugh argues that the amount that Will spent to maintain 608—approximately $200,000 per year—was extravagant and went beyond mere maintenance. Thus, even if the act of using Xenia's money to pay these costs was not a breach of fiduciary duty, the sheer amount of funds spent did constitute such a breach. We disagree, inasmuch as the record reveals that Irwin and Xenia historically spent that much on an annual basis to maintain the property. Inasmuch as we have already concluded that the AIFs were entitled to take Xenia's intent into account, and her intent can easily be gleaned from her past actions, we do not find error in this regard.

### Real Estate: 2607 Expenditures

■ Hugh also avers that the trial court should have found that the AIFs' use of Xenia's funds to renovate the 2760 Property after the IMA expressed interest therein was a breach of their fiduciary duties to her and should have ordered that the $554,318 spent for this purpose be refunded to Xenia's estate. According to Hugh, the AIFs could not have intended to authorize these expenses to satisfy Xenia's high standards, inasmuch as they allowed 2760 to deteriorate to a "shabby" condition before the IMA expressed interest in the property. Appellant's Br. p. 48. We find it puzzling that Hugh simultaneously complains about the shabby condition of Xenia's home even as he argues that the AIFs should not have renovated the property to improve the conditions.

Regardless, the decision to renovate 2607 to make it more appealing to the IMA, with the ultimate goal of donating it to the museum, comports with the general philanthropic goals of Xenia and Irwin. The AIFs concluded, after careful consideration, that it is what she would have wanted done with her home after her death, and we cannot say that they breached their fiduciary duties by preparing, during her lifetime, to effect this plan.

### Real Estate Expenditures: Muskoka

■ Hugh next argues that the trial court should have found that the AIFs' use of Xenias funds to maintain Muskoka was a breach of their fiduciary duties to her and ordered them to refund $900,000 to her estate that was used to maintain the Canadian property. Essentially, Hugh contends that because Xenia no longer traveled to Muskoka or used the property, her funds should not have been used to maintain it. As noted above, however, it is undisputed that she intended to continue to maintain the property so that her family could enjoy it. Indeed, Irwin explicitly stated to the children that he and Xenia viewed the property as a spiritual investment.

To conclude that because she became incapacitated Xenia's funds should no longer be used to maintain the Canadian property would be to ignore all that she lived her life for merely because she was no longer able to express those desires. One of the purposes of a POA is to ensure that a person who can no longer make her own decisions is able to have those decisions made for her in a way that comports with the way in which she lived her life. The continued maintenance of Muskoka did precisely that, and we find no error on this basis.

### Redemption of IMCO's Interest in Advisors

■ Next, Hugh contends that the trial court erred by denying his request that the AIFs "valuate and refund Xenia's estate for her $3.9 million interest in [IMC] Advisors that they redeemed for $1,000." Appellant's Br. p. 41. The trial court found that the $1,000 redemption was ap-

propriate because the IMCo "interest was valued and withdrawn pursuant to a contractual commitment." Appellant's App. p. 75. Hugh argues, however, that the trial court erroneously interpreted IMC Advisors' Operating Agreement.

In relevant part, Section 8.3 of the Operating Agreement provides as follows:

> In the event that a Member desires to transfer all or any portion of their [sic] Interest in the Company, such Member shall first be obligated to offer such Interest to the remaining Members of the Company or to the Company. The selling price for such Interest shall be determined as follows: [an appraiser will be hired to appraise the Interest, and the Member will be able to accept or reject the appraisal.] ... In the event that the Withdrawing Member so elects, such Withdrawing Member agrees that the purchase price for their [sic] entire Interest in the Company shall be the positive balance in the Withdrawing Member's Capital Account (irrespective of the fact that the appraised value of such Member's Interest may or does exceed such positive Capital Account balance) if such Member desires to provide services to existing clients of the Company....

Hugh Ex. 21 p. 11–12. It is undisputed that no appraisal occurred, but we find the omission of an appraisal to have been harmless, inasmuch as IMCo elected to accept its capital contribution as the value of its interest and intended to continue to provide services to existing clients of IMC Advisors. Hugh makes much of the fact that Xenia was incapacitated and unable to compete with IMC Advisors, but he misses the point that *IMCo*, rather than Xenia, owned this interest. IMCo intended to—

and, in fact, did—compete with IMC Advisors. Therefore, pursuant to the terms of the operating agreement, IMCo was *required* to redeem its share for $1,000.[4]

Additionally, we note that it is undisputed that the redemption decision was made in good faith, based upon concerns about potential disclosure of the private family's financial information. Additionally, Will consulted with an attorney about the issue, being careful to take appropriate actions.

Hugh also argues that the AIFs breached their fiduciary duty by consenting to this transaction because it caused Xenia to lose her multi-million-dollar interest in the company and directly benefited Sarla, who still retained the majority stake of IMC Advisors at that time. The record reveals, however, that Sarla ultimately redeemed her interest in IMC Advisors under the same operating provision, also in exchange for return of her $1,000 capital contribution, despite the fact that at that time, she owned a 53% stake in IMC Advisors. Thus, she did not benefit from the IMCo transaction.

### III. Specificity of the Accounting

Hugh next contends that the trial court erred by finding that the AIFs' second accounting was sufficient and that, to the extent Hugh had lingering questions, the AIFs' agreement to open the books to Hugh and his attorney sufficed to fulfill their burden. He contends that "opening the books" "does not meet the statutory duty to render a written accounting when ordered by a court" to do so. Appellant's Br. p. 54 (citing I.C. § 30–5–6–4(b) ("[t]he [AIF] shall render a written accounting if an accounting is ordered by a court")).

4. Although Hugh argues that IMCo should have made a written election of its desire to redeem its interest in this fashion, nothing in the agreement requires a written election. Therefore, we find no error on this basis.

Initially, we note that the trial court found that Hugh stipulated that his objections were satisfied by the AIFs' agreement to open the books to him. Thus, he waived any later objection to the inadequacy of that resolution. He disagrees, insisting that "[t]he requirement that the [AIFs] open the books was not in lieu of an accounting, but was an independent directive." Appellant's Br. p. 56. The record does not support that assertion, however, and we find that his objections with regard to the specificity of the accountings have been waived.

In any event, the record reveals that the AIFs *did* render a written accounting. In fact, they rendered two separate accountings, in each case providing a general, public accounting and a private, more specific one. That their accountings were not as specific as Hugh would have liked does not mean that they breached a statutory duty. In short, we agree with the AIFs that

> the purpose of an accounting is simply to make the interested parties aware of the fiduciaries' activities. Will and Sarla did that. Providing access to the documents behind the accountings gives the interested parties even more information about the fiduciaries' activities. Will and Sarla did that, too. Based on the accountings, and on the background information provided, the burden then shifted the interested party to "show specific instances of impropriety." *Matter of Willey's Trust,* 433 N.E.2d 1191, 1194 (Ind.Ct.App.1982). That Hugh did not do.

Appellees' Br. p. 69 (some internal citations omitted). We find no error with regard to the accountings.

### IV. Trust Issues

The majority of Hugh's argument on appeal is related to the POA and Will and Sarla's roles as Xenia's AIFs. Almost as an afterthought, he also argues that they breached their roles as co-trustees of Irwin's trust by authorizing the release of funds from the trust to Xenia for maintenance of 608 and Muskoka and renovation of 2760. He argues that these expenses did not directly benefit Xenia and, consequently, it was a breach of fiduciary duty to authorize them.

Hugh has raised this argument for the first time on appeal, and has consequently waived it. Although counsel contended at oral argument that the way in which the trial court structured the hearing—by consolidating the POA and trust issues into one hearing—relieved Hugh of the burden of objecting to the actions of both the AIFs and the co-trustees, we disagree. That the matters were consolidated and structured in an inconvenient way does not mean that Hugh was not required to raise specific objections and arguments about the issues he believed to be important. Therefore, we find that he has waived this issue.

Waiver notwithstanding, we note that it is undisputed that the AIFs made all of the expenditures at issue in their capacity as AIFs and not as co-trustees. Furthermore, Irwin's trust provides that the co-trustees "may exercise any discretion to pay income or principal of the trust for any purpose whatsoever...." Appellant's App. p. 185. The trust also specifies that if Irwin predeceased Xenia, the co-trustees were to pay the balance of the Trust Estate to her. *Id.* at 162. Therefore, the co-trustees were acting as instructed by paying trust funds to Xenia, and we find no error in this regard.

### V. Attorney Fees

Finally, Hugh argues that the trial court should have granted Hugh's

request for attorney fees and costs and denied the AIFs' similar request. We review the decision to award or deny attorney fees for an abuse of discretion. *Allen v. Proksch*, 832 N.E.2d 1080, 1102 (Ind.Ct. App.2005). Indiana follows the American Rule, which ordinarily requires each party to pay his own attorney fees in the absence of an agreement between the parties, statutory authority, or rule to the contrary. *Id.*

■ Initially, we note that the AIFs did not request attorney fees until they submitted their proposed findings and conclusions to the trial court, giving Hugh no opportunity to respond to the request. The AIFs point to their May 29, 2009, response to Hugh's final objections, in which they respond to Hugh's request for attorney fees by arguing that "[i]f any party should be entitled to attorney fees, it is the Estate of Mrs. Miller." Appellant's App. p. 782. We do not find that this brief reference to fees suffices to preserve the later, tardy request. This did not put Hugh on notice that they were requesting fees. Consequently, they waived the request by delaying an actual request until they submitted their proposed findings to the trial court.

Waiver notwithstanding, the AIFs argue that they are entitled to attorney fees because his continued maintenance of the litigation was frivolous, unreasonable, or groundless. *See Natare Corp. v. Cardinal Accounts, Inc.*, 878 N.E.2d 1290, 1292 (Ind. Ct.App.2008) (providing that attorneys "are expected to dismiss promptly claims that are found to be frivolous, unreasonable, or groundless. If a party continues to litigate a case past that point, the litigation becomes frivolous and attorney fees for the other party 'from that point in the litigation at which pursuing the claim became frivolous' are warranted"). Initially, we note that it was the *AIFs* who began

the instant litigation by seeking a release of all liability. This is not a case in which a plaintiff filed a lawsuit and continued to pursue his claims past the point of frivolousness. Instead, Hugh objected, as he had a right to do, to the AIFs' accountings and their request for a release from liability.

■ The AIFs argue that by failing to carefully sift through all of the documents they provided pursuant to his request, and by failing to question the Millers' primary accountant in any depth, Hugh relinquished his right to pursue his objections. In other words, the four-day hearing was frivolous because he did not examine the underlying accounting issues carefully enough. While we are sympathetic to the AIFs' claim in this regard, we do not find that Hugh's actions constitute the sort of frivolous, groundless litigation that warrants attorney fees. Hugh had fair concerns and raised substantive, well-considered arguments, though he could have done a more careful job sifting through the accounting issues. Under these circumstances, we find that the trial court erred by ordering Hugh to pay the AIFs' attorney fees.

■ Hugh also argues that he was entitled to attorney fees pursuant to three statutory sections. *See* Ind.Code § 30–4–3–22(3) (providing that a beneficiary who successfully maintains an action for breach of trust is entitled to attorney fees); Ind. Code § 30–5–6–4.5(c) (providing that an AIF that is found to have breached his fiduciary duties to the principal may be responsible for the payment of costs incurred to defend his actions); Ind.Code § 30–5–9–11 (providing that an AIF that violates his duties is liable for the attorney fees and costs paid as a result of the violation). All of these statutes, however, condition a fee award upon a showing of wrongdoing, which the trial court did not

find. And as we have already concluded herein, we do not find that the trial court erred in its substantive conclusion that the AIFs did not breach any duties to Xenia or that the co-trustees breached any duties under the trust. Therefore, the trial court properly denied Hugh's attorney fee request.

## CONCLUSION

What's past is prologue. Xenia and Irwin Miller lived their lives with a goal of helping others, and, while competent during their lifetimes, they spent their money with that goal in mind. Xenia's AIFs did not breach a duty to her by continuing to abide by her wishes. Therefore, we find that the trial court properly accepted the accountings, released the AIFs from all liability, and declined Hugh's attorney fee request. We also find, however, that the AIFs are not entitled to their attorney fees and reverse the judgment to that extent only.

The judgment of the trial court is affirmed in part and reversed in part.

NAJAM, J., and MATHIAS, J., concur.