

FILED

May 04 2023, 9:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Neal F. Eggeson, Jr.
Eggeson Privacy Law
Fishers, Indiana

ATTORNEYS FOR APPELLEE

A. Richard M. Blaiklock
Wade D. Fulford
Lewis Wagner, LLP
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Kristyn R. Plummer and Angela
M. Stillabower,

*Appellants-Claimants,*

v.

Amy L. Beard, Commissioner of
the Indiana Department of
Insurance,

*Appellee-Respondent*

May 4, 2023

Court of Appeals Case No.
22A-CT-2559

Appeal from the Marion Superior
Court

The Honorable Cynthia Ayers,
Judge

Trial Court Cause No.
49D04-2104-CT-011760

**Opinion by Judge May**
Judges Crone and Weissmann concur.

**May, Judge.**

Kristyn R. Plummer and Angela M. Stillabower (collectively, "Appellants") appeal the trial court's order granting summary judgment in favor of Amy L. Beard, in her capacity as Commissioner of the Indiana Department of Insurance, which administers the Indiana Patient Compensation Fund (collectively, "the Fund").[1] Appellants raise several issues, which we consolidate, revise, and restate as:

> 1. Whether Appellants' claim against Columbus Regional Hospital ("CRH") falls under *Community Hospital v. McKenzie*, 185 N.E.3d 368 (Ind. 2022), such that it sounds in ordinary negligence rather than medical malpractice;

> 2. Whether, if *McKenzie* controls, it should be applied retroactively to Appellants' claim; and

> 3. Whether, if *McKenzie* controls, the Fund has statutory authority to challenge Appellants' right to access the Fund after Appellants reached a settlement with CRH.

We affirm.

# Facts and Procedural History

---

[1] During the timeframe relevant herein, our legislature had limited the amount a patient could recover for an act of malpractice to $1,250,000. Ind. Code § 34-18-14-3(a)(3). The liability of a qualified health care provider was limited to the first $250,000 in damages. Ind. Code § 34-18-14-3(b). If a plaintiff settled with a qualified health care provider for an amount greater than $250,000, the plaintiff could petition to receive the excess damages from the Fund. Ind. Code § 34-18-15-3.

[2] Each of the Appellants lives in Columbus, Indiana. Plummer's husband is Michael Cool, and Cool's ex-wife is Lindsay R. Johnson-Heck. Johnson-Heck is currently married to Stephen Heck, and Heck shares a son from a prior relationship with Stillabower.

[3] From 1993 until 2006, Johnson-Heck worked as a registered nurse at CRH. In April 2012, Johnson-Heck returned to CRH as an employee of Emergency Physicians, Inc. of Columbus ("EPIC"), the exclusive provider of emergency department services at CRH. In 2014 Johnson-Heck began working for Southern Indiana ENT ("SIENT"). During all relevant times, CRH gave Johnson-Heck clinical privileges. Between January 2014 and June 2015, Johnson-Heck allegedly used her CRH-granted privileges to access medical records of twenty-three individuals who were not her patients. She accessed Plummer's records on May 2, 2014, and Stillabower's records on June 3, 2014; July 16, 2014; August 5, 2014; and June 20, 2015.

[4] Stillabower and Heck (Johnson-Heck's then current husband) were embroiled in a custody/visitation disagreement when Johnson-Heck and Heck via text message and emails revealed to Stillabower that they knew some of Stillabower's personal medical information. Stillabower contacted CRH to voice her suspicion that someone had accessed her protected health information. CRH's investigation revealed Johnson-Heck's access to Stillabower's records as early as June 29, 2016, but CRH did not notify Stillabower of the nature and extent of the breach until early October 2016. In

early October 2016, Plummer received a letter from CRH notifying her about Johnson-Heck's unauthorized access into her medical records.[2]

[5] On April 25, 2017, Appellants filed a Proposed Complaint with the Indiana Department of Insurance against CRH and Johnson-Heck alleging they "breached their statutory and common law duties of confidentiality and privacy" and Appellants had suffered damages as a result. (App. Vol. III at 11.) The matter was submitted to a medical review panel, which issued its opinion on September 11, 2019:

> The panel is of the unanimous opinion that the evidence does not support the conclusion that defendant [CRH] failed to meet the applicable standard of care, and therefore, its conduct complained of was not a factor of any resultant damages.
>
> The panel is of unanimous opinion that the evidence supports the conclusion that defendant [Johnson-Heck] failed to comply with the appropriate standard of care, but the panel is unable to determine from the evidence whether her conduct was or was not a factor of the resultant damages.

(App. Vol. II at 220.) Appellants then filed an amended complaint that alleged CRH was vicariously liable for Johnson-Heck's breach of their privacy, CRH was liable for negligent training and supervision of Johnson-Heck, CRH was liable for its own inadequate protection of confidential patient information, Johnson-Heck was liable for "negligence, breach of professional duty, invasion

---

[2] Johnson-Heck allegedly shared Plummer's personal medical information with Cool in 2015.

of privacy by intrusion, invasion of privacy by public disclosure of private facts, intentional infliction of emotional distress, [and] negligent infliction of emotional distress[.]" (App. Vol. III at 19) (capitalization removed).

[6] On April 5, 2021, CRH and Appellants entered into a Mediation Agreement and Settlement Agreement. The Mediation Agreement stated that it was "not contingent on [Fund] access or further recovery," (*id.* at 28), such that Plummer and Stillabower acknowledged the potential they might not recover any payment from the Fund. As part of the Settlement Agreement, CRH (and/or its insurers) agreed to pay (1) $107,001.00 to counsel; (2) $71,499.50 to Stillabower, and (3) $71,499.50 to Plummer. Neither individual received a total of $250,000, but the total payout from CRH was $250,000.

[7] On April 7, 2021, Appellants filed their Petition for Payment of Damages from the Fund in the Marion Superior Court, alleging they were "separate, independent, non-derivative victims of a single act of malpractice[.]" (App. Vol. II at 26.) On April 18, 2022, Appellants filed a motion for summary judgment that argued the facts of this case fall within the Medical Malpractice Act ("MMA"). The Fund responded to Appellants' motion to dispute the claim fell under the MMA and filed a cross-motion for summary judgment contending Appellants failed to recover the statutorily-required amounts to obtain monies from the Fund.

[8] After a hearing, the trial court determined, in reliance on *Community Health Network, Inc. v. McKenzie*, 185 N.E.3d 368 (Ind. 2022), "that unauthorized

access to confidential medical records by a person, not directly related to medical care and treatment of the complainant, is not covered by the MMA and that setting policy for medical records access is an internal non-medical treatment provider's business decision." (App. Vol. II at 20.) The trial court also noted the MMA "allows for one recovery for each distinct act of malpractice that results in a distinct injury, even if multiple acts of malpractice occur in the same procedure." (*Id*. at 21) (quoting *Walen v. Hossler*, 130 N.E.3d 138, 147 (Ind. Ct. App. 2019)). Because the evidence revealed Johnson-Heck did not access Appellants' records on the same date, the trial court concluded in the alternative that Johnson-Heck committed separate acts of malpractice for which an individual recovery of $250,000.00 must be made prior to money from the Fund becoming available. (*Id*. at 22.) The trial court denied Appellants' Motion for Summary Judgment and granted the Fund's Motion for Summary Judgment.

## Discussion and Decision

[9] "'When reviewing the grant or denial of a motion for summary judgment we stand in the shoes of the trial court.'" *Supervised Estate of Kent*, 99 N.E.3d 634, 637 (Ind. 2018) (quoting *City of Lawrence Utils. Serv. Bd. v. Curry*, 68 N.E.3d 581, 585 (Ind. 2017)). Summary judgment should be granted "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C).

> The party moving for summary judgment bears the burden of making a prima facie showing that there is no issue of material fact and that it is entitled to judgment as a matter of law. The burden then shifts to the non-moving party to show the existence of a genuine issue.

*Burton v. Benner*, 140 N.E.3d 848, 851 (Ind. 2020). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed facts support conflicting reasonable inferences[.]" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (citations omitted). Any doubts about the facts, or the inferences to be drawn from the facts, are resolved in favor of the non-moving party. *Burton*, 140 N.E.3d at 851. Where the challenge to summary judgment raises questions of law, we review them de novo. *Rogers v. Martin*, 63 N.E.3d 316, 320 (Ind. 2016).

[10] Findings of fact and conclusions of law entered by the trial court aid our review, but they do not bind us. *Supervised Estate of Kent*, 99 N.E.3d at 637. Nor is our standard of review or analysis altered by the parties' filing of cross-motions for summary judgment – we simply "'consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law.'" *Erie Indemnity Co. v. Estate of Harris*, 99 N.E.3d 625, 629 (Ind. 2018) (quoting *SCI Propane, LLC v. Frederick*, 39 N.E.3d 675, 677 (Ind. 2015)). The party appealing the trial court's decision has the burden to convince us the trial court erred, but we scrutinize the trial court's decision carefully to make sure a party was not improperly denied its day in court. *Ryan v. TCI Architects*, 72 N.E.3d 908, 913

(Ind. 2017). Indiana "consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014).

Not all claims by patients against healthcare providers fit within the MMA, nor is the MMA intended to encompass cases of ordinary negligence. *Doe v. Ind. Dept. of Insurance*, 194 N.E.3d 1197, 1200 (Ind. Ct. App. 2022). Instead, the MMA covers only "curative or salutary conduct of a health care provider acting within his or her professional capacity" and "not conduct unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment." *Id*. (quoting *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 185 (Ind. 2011)).

> The fact that the alleged misconduct occurred in a healthcare facility, or that the injured party was a patient at the facility, is not dispositive of whether the MMA applies. Instead we must look to the substance of the claim and determine whether it is based on the provider's behavior or practices while acting in his or her professional capacity as a provider of medical services. We have explained:
>
>> A case sounds in ordinary negligence where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community. By contrast, a claim falls under the MMA where there is a causal connection between the conduct complained of and the nature of the patient-health care provider relationship.

Thus, "acts or omissions of a health care provider unrelated or outside the provider's role as a health care professional" are outside the reach of the MMA.

"In sum, the appropriate analysis involves first, the nature of the conduct alleged in the complaint – whether or not the alleged negligence involves provision of medical services – and, second, whether the rendering of medical services is to the plaintiff for the plaintiff's benefit."

*Id.* (internal citations and footnote omitted). Whether a case is ordinary negligence or medical malpractice that falls under the MMA is a "question for the court," *Rossner v. Take Care Health Sys., LLC*, 172 N.E.3d 1248, 1255 (Ind. Ct. App. 2021), *trans. denied*, and as such it is "particularly suited for determination on summary judgment." *Doe*, 194 N.E.3d at 1199.

## 1. Does Appellants' claim against CRH fall under *McKenzie*?

[12] We begin our analysis with discussion of our Indiana Supreme Court's decision in *Community Health Network, Inc. v. McKenzie*, 185 N.E.3d 368 (Ind. 2022), on which the trial court relied when granting summary judgment to the Fund. In *McKenzie*, Katrina Gray, who worked for an orthopedic practice in the Community Health Network ("Community"), had been given access to Community's confidential medical records system so that she could schedule appointments and release records for patients of the orthopedic practice. *Id.* at 374. Gray also used that access to improperly browse the medical records of 160 people who were not patients of the orthopedic practice. *Id.* Amongst

those 160 people were seven members of the family of Heather McKenzie, with whom Gray had a "long-running family feud." *Id*. at 373.

[13]   The McKenzie family members (collectively "the McKenzies") filed a lawsuit against Community and Gray in Marion Superior Court. *Id*. at 374. Against Community, the McKenzies asserted claims of respondeat superior and negligent training, supervision, and retention, and against Gray, the McKenzies asserted claims of negligence and invasion of privacy. Community filed a motion to dismiss for lack of subject matter jurisdiction in which Community asserted the McKenzies could not proceed in the trial court without first satisfying the jurisdictional requirements of Indiana's MMA.[3] *Id*. The trial court denied Community's motion to dismiss after finding the McKenzies did not need to satisfy the jurisdiction requirements of the MMA because the McKenzies "'were not patients of the practice at which Gray worked' and Gray's alleged misconduct 'did not involve providing medical treatment to them.'" *Id*. at 375 (quoting trial court order). The Court of Appeals affirmed the trial court's denial of the motion to dismiss after concluding the McKenzies' claims did not fall under the MMA, and Community petitioned for transfer. *Id*.

---

[3] Community also filed a motion for summary judgment, and the trial court denied that motion based on what it found to be genuine issues of material fact. Our Indiana Supreme Court held Community was entitled to summary judgment on all of the McKenzies' claims for reasons not relevant to the issues before us in this appeal. *See McKenzie*, 185 N.E.3d at 379 (negligence-based claims fail because damages for emotional injury are unavailable without physical injury satisfying modified impact rule or bystander rule) & 383 (public disclosure of private facts claim fails because there was no evidence disclosure as to public or large number of people). As those issues are not relevant to the issues herein, we will not discuss the facts and analysis of those issues in any detail herein.

[14] Our Indiana Supreme Court affirmed the trial court's denial of the motion to dismiss because "[t]he misconduct alleged does not constitute 'malpractice[.]'" *Id*.

> Malpractice is a 'tort or breach of contract based on health care or professional services that were provided or that should have been provided, by a healthcare provider, to a patient.' I.C. § 34-18-2-18. This definition imposes four requirements, two of which are not challenged here — [the McKenzies] allege a 'tort…by a health care provider,' and [the McKenzies] are all 'patient[s]' of Community. *See id*. The contested issues are whether the tortious conduct was (1) based on 'health care' or 'professional services' (2) that were, or should have been, provided 'to a patient.' *Id*. Because neither requirement is met, we hold the MMA does not apply.

> To determine whether the conduct was based on 'health care' or 'professional services,' we look first to the definitions provided in the MMA. 'Health care' is 'an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient **during** the patient's medical care, treatment, or confinement.' *Id*. § -13 (emphasis added). The statute's focus on timing—requiring that the alleged tortious conduct (whether by omission or commission) occur 'during' a patient's care, treatment, or confinement—imposes a temporal requirement that tethers the misconduct to patient care. *See id*. But here, neither [the McKenzies] nor Community have alleged or shown any such connection. And without this requisite temporal tie, the underlying actions are not 'health care' under the MMA.

> The remaining question is whether the unauthorized access of [the McKenzies'] medical records qualifies as a 'professional service' under the MMA. Unlike 'health care,' 'professional

service' is not defined in the MMA. Community contends that its 'maintenance of medical records, as well as its determination and utilization of the appropriate mechanisms, training protocols, and procedures for logging, auditing, monitoring, detecting, or otherwise securing access to patient records, are professional services.' To be sure, Community uses professional judgment when it establishes protocols for creating, maintaining, and accessing patient information. But even if we assume that the mere exercise of professional judgment makes doing so a 'professional service,' Community's relevant protocols and procedures could support a malpractice claim only if they were provided 'to a patient.' *Id*. § -18.

Although this case presents a close call, on this record we conclude that Community's internal business decisions and access protocols for medical records are not professional services provided to a patient. Community acts largely on its own behalf in developing and implementing its policies for safeguarding confidential patient health information. And those policies - which are directed inward to Community employees, not outward to its patients - are used to execute Community's regulatory obligations and balance its business risks. Simply put, Community's applicable protocols and procedures are neither conduct related 'to the promotion of a patient's health' nor do they require 'the provider's exercise of professional expertise, skill, or judgment.' *Gordon*, 952 N.E.2d at 185. Additionally relevant here, [the McKenzies] were not patients of any of the orthopedic providers for whom Gray was responsible for scheduling appointments and releasing medical records. Thus, Gray's unauthorized access of [the McKenzies'] medical records was unrelated to any professional service executed on their behalf as Community's patients.

To summarize, the alleged misconduct does not fall under the MMA. It lacks a temporal connection to any care provided by Community to the Plaintiffs as patients. And it was also

> unrelated to either the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.

*McKenzie*, 185 N.E.3d at 376-77.

[15] Appellants claim we should reach a different result herein because three factual differences make their circumstances distinguishable from *McKenzie*. We disagree, but we address each of Appellants' assertions to further explain our reasoning.

[16] First, Appellants assert that, in *McKenzie*, the tortfeasor worked for an orthopedic practice where none of the victims were patients, while herein Johnson-Heck worked for CRH where both Plummer and Stillabower were patients. However, while Johnson-Heck worked at CRH during the years in question and had clinical privileges at CRH, both Johnson-Heck and CRH indicated Johnson-Heck did not work *for* CRH during months when she accessed the medical records of Plummer and Stillabower. Instead, Johnson-Heck was employed by EPIC and SIENT. (*See* Appellants' App. Vol. II at 54, 60 ("At the time of each inappropriate access to Plaintiffs' electronic health record, Johnson-Heck was an employee of either EPIC or SIENT[.]"); & 110 n.1 (indicating Johnson-Heck was employed by EPIC and SIENT, which had relationships with CRH but were "separate entities from CRH").) Accordingly, Johnson-Heck's employment for a third-party provider who had been given access to the hospital's records places her in precisely the same position as the tortfeasor in *McKenzie*.

[17] Moreover, Johnson-Heck's legal submission to the Medical Review Panel admitted she "never provided care to either Plummer or Stillabower, nor did she ever have a practitioner-patient relationship with either of them." (*Id.* at 114.) Accordingly, her accessing of Appellants' medical records "lacks a temporal connection to any care provided" by CRH to Appellants as patients. *McKenzie*, 185 N.E.3d at 377. As such, her alleged misconduct cannot be construed as "'health care' under the MMA." *Id.* at 376 ("without this requisite temporal tie, the underlying actions are not 'health care' under the MMA").

[18] Second, Appellants assert that, unlike in *McKenzie*, they "were being provided a service of 'professional expertise, skill, or judgment' when [Johnson-Heck] accessed their records[.]" (Appellants' Br. at 24.) In support of this assertion, Appellants quote Johnson-Heck's submission to the Medical Review Panel:

> Johnson-Heck denies that her access to the records of Plummer and Stillabower constituted misconduct. Nor was the access improper. HIPAA does allow for physicians, medical professionals, and hospitals to access patient information to ensure adequate and appropriate care is being provided and to evaluate the quality of care being provided.

(*Id.* at 23 (citing App. Vol. II at 111).) However, if, as Appellants now assert, Johnson-Heck was providing them with a professional service permitted by HIPAA, then arguably CRH could not be liable for Johnson-Heck's accessing of Appellants' medical records. Not only would Appellants avoid application of *McKenzie*, but they ought also dismiss this action altogether. Moreover, while HIPAA might permit medical professionals and hospitals to access

patient information to evaluate quality of care, there is nothing in the record before us to suggest Johnson-Heck had been given authorization to evaluate the quality of care provided to people who had never been her patients (and also happened to be married to Johnson-Heck's ex-husband or to be the mother of a child with Johnson-Heck's current husband). We decline to hold Appellants' case is distinguishable from *McKenzie* on this basis. *See McKenzie*, 185 N.E.3d at 376 ("Gray's unauthorized access of Plaintiffs' medical records was unrelated to any professional service executed on their behalf as Community's patients.").

[19] Finally, Appellants note there was no medical review panel decision in *McKenzie*, while a unanimous medical review panel reached a determination regarding whether Johnson-Heck or CRH breached the appropriate standard of care. Appellants assert this "factor is of particular significance given that '[the Medical Review Panel is] empowered to determine whether its opinion is called for since the Act provides for no other body to make that determination.'" (Appellants' Br. at 24.)[4] However, as noted above, whether facts state a claim for ordinary negligence or medical malpractice under the MMA is a "question for the court." *Rossner*, 172 N.E.3d at 1255. Accordingly, we do not find

---

[4] In support of this assertion, Appellants claimed to be quoting a concurring opinion from Judge Garrard in *Guinn v. Light*, 536 N.E.2d 546, 549 (Ind. Ct. App. 1989), *reh'g denied*, *trans. granted.* We remind counsel for Appellants that the granting of a petition to transfer by our Indiana Supreme Court vacates any opinion from the Court of Appeals unless the Supreme Court invokes one of the two exceptions provided in Appellate Rule 58. As our Supreme Court did not invoke an exception in *Guinn*, *see Guinn v. Light*, 558 N.E.2d 821, 824 (Ind 1990) ("We vacate the opinions of the Court of Appeals…."), there remained no Court of Appeals opinion for Appellants to cite in support of any legal assertion. *See* Appellate Rule 58 ("Upon the grant of transfer, the Supreme Court shall have jurisdiction over the appeal and all issues as if originally filed in the Supreme Court.").

compelling Appellants' assertion that the existence of a medical review panel decision distinguishes this case from *McKenzie*.

[20] For all these reasons, we reject Appellants' attempts to avoid the application of *McKenzie* to the facts of their case. Johnson-Heck's use of her CRH privileges to access medical records of Appellants, who were not her patients, "was unrelated to any professional service executed on their behalf as [CRH] patients." *See McKenzie*, 185 N.E.3d at 376. Moreover, to the extent CRH was exercising professional judgment when designing "protocols for creating, maintaining, and accessing patient information[,]" *id.*, those professional services were not provided "to a patient." *See id.* (holding Community's professional judgments about policies around patient information systems were "directed inward to Community employees, not outward to its patients"). Appellants' claim sounds in ordinary negligence rather than medical malpractice.

[21] Nevertheless, Appellants urge us to allow them to avoid the application of McKenzie based on the timing of the McKenzie decision and the timing of the Fund's challenge to their claim for excess damages. We address each of these additional arguments in turn.

## 2. Should *McKenzie* apply retroactively?

[22] Appellants argue *McKenzie* should not be applied retroactively because "*McKenzie* charted a new course away from clear past precedent" on which the parties relied. (Appellant's Br. at 20.) In *Arrendale v. American Imaging & MRI*,

our Indiana Supreme Court was asked to decide whether the apparent agency principles outlined in *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 152-53 (Ind. 1999), should be expanded to non-hospital medical facilities. One of the parties therein – Marion Open MRI – asked that any expansion be made prospective only. The Court said:

> We have observed that "[p]rospective application is an extraordinary measure[,]' *Lowe v. N. Ind. Comm. Transportation Dist.*, 177 N.E.3d 796, 800 (Ind. 2021), and "[a]ppellate court decisions routinely apply to the parties involved, and everyone else, even when addressing an unresolved point of law." *Ray-Hayes v. Heinamann*, 768 N.E.2d 899, 900 (Ind. 2002). Accordingly, we decline to apply today's rule prospectively only, and apply it to Marion Open MRI.

*Arrendale*, 183 N.E.3d at 1073 n.4 (alterations in *Arrendale*). We see no reason a different result should occur herein. *See also Eakin v. Kumiega*, 567 N.E.2d 150, 153, 153 n.5 (Ind. Ct. App. 1991) (hereinafter "*Kumiega*") (noting Court of Appeals could not exempt the Eakin family from the "harshness" of the required legal ruling because an exception for the Eakin family "would create the potential for an anamolous result in subsequent cases"), *trans. denied*, *abrogated as to the unavailability of emotional distress damages without physical impact by Shaumber v. Henderson*, 579 N.E.2d 452 (Ind. 1991) (adopting modified impact rule).

### 3. Can the Fund challenge Appellants' claim?

[23] Appellants next argue we should not apply *McKenzie* to their claim because the Fund has no authority to challenge Appellants' claim for funds in excess of CRH's payment. In support thereof, Appellants cite Indiana Code section 34-18-15-3, which provides the procedure to be followed to make a claim against the Fund. Accordingly, addressing Appellants' argument requires us to interpret and implement the controlling statute, which is a question of law that we review de novo. *McKenzie*, 185 N.E.3d at 375 ("The interpretation of the MMA presents a question of law subject to de novo review.").

[24] Indiana Code section 34-18-15-3 provides, in relevant part:

> If a health care provider or its insurer has agreed to settle its liability on a claim by payment of its policy limits established in IC 34-18-14-3(b) and IC 34-18-14-3(d), and the claimant is demanding an amount in excess of that amount, the following procedure must be followed:
>
> (1) A petition shall be filed by the claimant . . . .
>
> * * * * *
>
> (3) The commissioner . . . may agree to a settlement with the claimant from the patient's compensation fund, or the commissioner . . . may file written objections to the payment of the amount demanded. . . . .
>
> (4) The judge of the court in which the petition is filed shall set the petition for approval or, if objections have been filed, for hearing, as soon as practicable. . . . .

(5) At the hearing, the commissioner, the claimant, the health care provider, and the insurer of the health care provider may introduce relevant evidence to enable the court to determine whether or not the petition should be approved if the evidence is submitted on agreement without objections. If the commissioner, the health care provider, the insurer of the health care provider, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, the court shall, after hearing any relevant evidence on the issue of claimant's damage submitted by any of the parties described in this section, determine the amount of claimant's damages, if any, in excess of the health care provider's policy limits established in IC 34-18-14-3(b) and IC 34-18-14-3(d) already paid by the insurer or the health care provider. The court shall determine the amount for which the fund is liable and make a finding and judgment accordingly. *In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established.*

Ind. Code § 34-18-15-3 (emphasis added).

[25] Appellants acknowledge Subsection (3) of that statute permits the Fund to object to the payment of the amount demanded by a claimant, but they assert Subsection (5) precludes the objection filed by the Fund herein, which Appellants argue is a challenge to "the liability of the health care provider as admitted and established" in violation of Subsection 5. Appellants claim the only Indiana authority regarding "whether the Fund may challenge MMA-applicability post-settlement" is a concurrence by Judge Shields in 1993 that demonstrates Appellants' position is correct. (Appellant's Reply Br. at 11

(citing *Dillon v. Callaway*, 609 N.E.2d 424 (1993) (hereinafter "*Callaway*"[5]), *trans. denied*.)  Appellants are simply wrong.

[26]     In 1991, the Commissioner of the Department of Insurance, Eakin, appealed a trial court ruling that allowed medical malpractice claimants, the Kumiegas, to access excess damages from the Patient's Compensation Fund for emotional distress that resulted from witnessing the death of their daughter.  *Kumiega*, 567 N.E.2d 150.  Eakin argued that allowing the Kumiegas to access the Fund was improper because the emotional distress damages sought were prohibited by Indiana's adherence to the impact rule, and our court agreed.  We held "the impact rule bars the Kumiegas' claim for emotional distress damages.  From this it follows that such *noncompensable injuries are not subject to payment from the Fund*."  567 N.E.2d at 153 (emphasis added).  In the process of reaching that holding, the court also specifically held:

> The Kumiegas also argue that the Commissioner's argument must fail because Ind. Code 16-9.5-4-3(5) [a prior version of the statute at issue herein with the same language in Subsection 5] requires the trial court to consider the health care provider's liability as "admitted and established."  While we agree that the statute requires such admitted liability, *we do not agree that the existence of a health care provider's liability obligates the Fund to compensate claimants for noncompensable injuries*.

---

[5] Dillon was the Commissioner of the Indiana Department of Insurance, which administers the Patient's Compensation Fund, and his name is also on other opinions to be discussed herein.  Accordingly, for clarity, we will refer to this case and others involving the Fund by the name of the Plaintiff/Appellee.

*Id*. at 152 n.4 (emphasis added). Thus, under *Kumeiga*, after a plaintiff and health care provider reach a settlement, the Fund may challenge the availability of excess damages under the Fund if the Fund believes the requested damages are for injuries that are "noncompensable" under the MMA. *See id*.

[27] Then, the next year, our court decided *Dillon v. Glover*, 597 N.E.2d 971 (Ind. Ct. App. 1992), *trans. denied*, in which the new Commissioner of the Indiana Department of Insurance, Dillon, challenged the availability of excess damages from the Fund based on the lack of evidence that the doctor's mistake had proximately caused Glover's damages. *Id*. at 792. As in *Kumiega*, the petition for excess damages from the Fund was filed after Glover settled with the doctor (or doctor's insurer) for the amount necessary to access the Fund. The *Glover* panel noted *Kumiega* "concluded that the admission of liability did not obligate the Fund to compensate claimants for noncompensable injuries[,]" *id*. at 793, but then distinguished *Kumiega* based on the fact that, in *Glover*, the Fund's challenge to proximate cause was prohibited by the health care provider's admission of liability. *See id*. ("once *liability* is established, the issue of proximate cause is decided") (emphasis in original).

[28] This is the context in which arose the *Callaway* opinion, 609 N.E.2d 424, and Judge Shields's concurring opinion, to which Appellants cite. Judge Shields's concurrence insisted the Fund's attempt to avoid payment of the excess damages was "foreclosed by the settlement made by [the doctor] and his insurer":

In my opinion, the Fund's arguments that the Act does not apply to Dr. Chambers's sexual relationship with Callaway and that Callaway's injuries were not the proximate result of health care services provided by Dr. Chambers raise an issue of liability rather than an issue of whether particular damages asserted by Callaway are compensable within the Act. Therefore, because "a health care provider or its insurer [Dr. Chambers and his insurer] has agreed to settle its liability on a claim by payment of its policy limits," IC 16-9.5-4-3 (1988), this court's decisions in *Dillon v. Glover* (1992), Ind. App., 597 N.E.2d 971, and *Eakin v. Kumiega* (1991), Ind. App., 567 N.E.2d 150, compel the determination that the issues the Fund attempts to present are precluded.

*Id*. at 429.

[29]　Appellants point to Judge Shields's language and assert "with liability conclusively established," the Fund cannot contest the applicability of the MMA. (Appellants' Br. at 18.) But this is an inaccurate reading of Judge Shields's concurrence. Judge Shields would have held the Fund's challenge precluded, but only because she believed the Fund to be raising "an issue of liability rather than an issue of whether particular damages . . . are compensable under the Act." *Callaway*, 609 N.E.2d at 429 (Judge Shields, concurring in result).

[30]　Thus, the language in Subsection (5) of Indiana Code section 34-18-15-3 prohibits post-settlement challenges to liability, *see Glover*, 597 N.E.2d at 973-74 (citing subsection 5 of prior version of the statute, then codified as Ind. Code § 16-9.5-4-3, which contained the same language), but does not prohibit post-settlement challenges to the non-compensability of damages under the MMA,

*see Kumeiga*, 567 N.E.2d at 152 n.4 (health care provider's admitted liability does not obligate the Fund to compensate claimants for noncompensable injuries under Subsection 5 of Ind. Code § 16-9.5-4-3, which is now found at Ind. Code § 34-18-15-3). This is why the majority opinion in Callaway explicitly stated: "the compensable nature of Callaway's injuries was not decided by her settlement of liability with [the doctor] and his insurer, and is properly before us." 609 N.E.2d at 426. Based on this precedent, we hold the Fund can challenge the compensable nature of the Appellants' damages under the MMA even after Appellants reached a settlement with providers that admitted liability.[6] *See also J.L. v. Mortell*, 633 N.E.2d 300, 303-304 (Ind. Ct. App. 1994) (holding trial court's inquiry into the compensable nature of the plaintiff's damages was proper based on *Callaway* and *Kumeiga*), *trans. denied*.

## Conclusion

[31] Appellants' claims cannot be distinguished from those asserted in *McKenzie* and, thus, do not state a claim for medical malpractice that is compensable from the Fund. *McKenzie* applies retroactively to Appellants' claim. Finally, as thirty years of precedent demonstrates, Indiana Code section 34-18-15-3(5) permits the Fund to challenge whether Appellants' claimed injuries are non-

---

[6] Because of this clear precedent, we decline Appellants' invitations to hold estoppel or waiver should preclude the Fund from raising its statutorily-permitted challenge to the compensability of Appellants' claims under the Fund. Moreover, because *McKenzie* applies and precludes recovering damages from the Fund, we need not determine whether Appellants' settlement with CRH was for the amount statutorily required to access the Fund.

compensable under the MMA. Because Appellants have not demonstrated any genuine issue of material fact about the application of *McKenzie* and the Fund is entitled to judgment as a matter of law, we affirm the trial court's grant of summary judgment to the Fund.

[32] Affirmed.

Crone, J., and Weissmann, J., concur.